# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 15-1497

_____

NATIONAL ASSOCIATION OF REGULATORY UTILITY
COMMISSIONERS,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and THE UNITED STATES OF AMERICA,

*Respondents*.

On Petitions for Review of an Order
of the Federal Communications Commission

## BRIEF OF PETITIONER

*James Bradford Ramsay*
GENERAL COUNSEL
*Jennifer Murphy*
ASSISTANT GENERAL COUNSEL
NATIONAL ASSOCIATION OF REGULATORY
    UTILITY COMMISSIONERS (NARUC)
1101 VERMONT AVE., NW, SUITE 200
WASHINGTON, DC  20005
(202) 898-2207

**Counsel for NARUC**

**April 4, 2016**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), petitioner the National Association of Regulatory Utility Commissioners certifies as follows:

## A.     PARTIES AND AMICI:

*1.     Parties that participated in the proceeding below:*

This list is based on Appendix A of the FCC Order on review listing persons who filed comments in the proceedings below:

Aero Communications LLC
Alliance for Telecommunications Industry Solutions
AT&T Services, Inc.
Bandwidth.com, Inc.
*California Public Utilities Commission*
CenturyLink
Comcast Corporation
COMPTEL
Flowroute LLC
GVNW Consulting, Inc.
HyperCube Telecom, LLC
*Idaho Public Utilities Commission*
Intelepeer, Inc.
Interisle Consulting Group LLC
Intrado Inc.
Level 3 Communications, LLC
*Michigan Public Service Commission*
*Minnesota Department of Commerce*
Municipal Emergency Communication Districts Association
*National Association of Regulatory Utility Commissioners*
*National Association of State Utility Consumer Advocates*
*Nebraska Public Service Commission*
Neustar, Inc.

*New Jersey Division of Rate Counsel*
NTCA –The Rural Broadband Association
*Oregon Public Utility Commission*
*Pennsylvania Public Utility Commission*
*Public Service Commission of Wisconsin*
Shockey Consulting
SmartEdgeNet, LLC
Spencer Telecom, LLC
Telcordia Technologies, Inc. d/b/a iconectiv
TeleCommunications Systems, Inc.
Terra Nova Telecom, Inc.
Texas Commission of State Emergency Communications
Texas 9-1-1 Alliance
Verizon and Verizon Wireless
Voice on the Net Coalition
Vonage Holdings Corp.
*Washington Utilities and Transportation Commission*
Windstream Corporation
XO Communications, LLC

2.     *Parties Participating in this appeal:*

The Petitioner in this case is the **National Association of Regulatory**

**Utility Commissioners**.

The Respondents in this case are the **Federal Communications**

**Commission** and the **United States of America**.

The Movant — Intervenor for Respondent is **Vonage Holdings**

**Corporation.**

**B.    RULING UNDER REVIEW:**

The Ruling under review is the FCC's Report and Order, *In the Matter(s) of Numbering Policies for Modern Communications*, WC Docket 13-97, *IP-Enabled Services*, WC Docket 04-36, *Telephone Number Requirements for IP-Enabled Services Providers*, WC Docket 07-243, *Telephone Number Portability*, CC Docket 95-116, *Developing a Unified Intercarrier Compensation Regime*, CC Docket 01-92, *Connect America Fund*, WC Docket 10-90, *Numbering Resource Optimization*, CC Docket 99-200, FCC 15-70, 30 F.C.C. Rcd. 6839, (rel. June 22, 2015)(*Order*).

**C.    RELATED CASES:**

The *Order* has not previously been the subject of a petition for review by this Court or any other court.  This is the only case to raise porting and number portability. However, there are other pending cases addressing classification issues central to this appeal.

[1]    The pending review of the FCC's Report and Order on Remand, Declaratory Ruling, and Order, *Protecting and Promoting the Open Internet*, 30 FCC Rcd 5601 (2015) does not purport to address the classification of Interconnected Voice-over-Internet-Protocol (I-VoIP), but it's classification analysis is relevant to the issues in this case.  It is pending in *United States*

*Telecom Association et al. v. FCC*, in United States Court of Appeals for the District of Columbia Circuit No. 15-1063 and consolidated cases.

While it seems likely there are more, the undersigned is only aware of two cases in federal court that have raised the question of the proper classification of I-VoIP as a "telecommunications service."

[2]    *Charter Advanced Services, LLC, et. al., vs. Beverly Jones Heydinger, et. al.,* (D. Minn.) CASE NO. 15-cv-3935-SRN-HB.

The Minnesota Commission is litigating the scope of its authority to impose State service quality obligations — preserved by Congress in 47 U.S.C. § 253(b) — to an "unregulated I-VoIP affiliate." It is ongoing.

[3]    The other is *Michigan Bell Telephone Company, d/b/a AT&T Michigan v. John D. Quackenbush, Greg R. White and Sally A. Talberg as Commissioners of the Michigan Public Service Commission*, in U.S. District Court, Western District of Michigan, Case No. 1:14-cv-00416. I have been told the case has settled but cannot find a notation to that effect in Pacer. The case involves a State's 47 U.S.C. § 252 backstop arbitration involving I-VoIP service. AT&T's arguments depend on the legal classification of I-VoIP being anything but a "telecommunications service". It claims there can be no State arbitration because I-VoIP is not a telecommunications service. Petitioner is not aware of any other related cases pending before this Court or any other Court.

iv

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the National Association of Regulatory Utility Commissioners (NARUC) respectfully submits this disclosure statement.  NARUC is a quasi-governmental nonprofit organization founded in 1889 and incorporated in the District of Columbia.  NARUC is a "trade association" as that term is defined in Rule 26.1(b).  NARUC has no parent company.  No publicly held company has any ownership interest in NARUC.  NARUC represents those government officials in the fifty States, the District of Columbia, Puerto Rico, and the Virgin Islands, charged with the duty of regulating, *inter alia*, the regulated electric utilities within their respective borders.

Respectfully submitted,

**/s/ James Bradford Ramsay**

_____

***James Bradford Ramsay***
GENERAL COUNSEL
NATIONAL ASSOCIATION OF REGULATORY
   UTILITY COMMISSIONERS
1101 VERMONT AVE., N.W., SUITE 200
WASHINGTON, D.C. 20005

**Dated: April 7, 2016**

# <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENTS ......................................................v

TABLE OF AUTHORITIES ................................................................ix

GLOSSARY ............................................................................xvi

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES.........................................................1

STATUTES AND REGULATIONS ....................................................2

STANDARD OF REVIEW ................................................................2

PRELIMINARY STATEMENT ...........................................................3

STATEMENT OF THE CASE ............................................................7

SUMMARY OF ARGUMENT ...........................................................16

STATEMENT OF STANDING ........................................................17

ARGUMENT ............................................................................17

I.      The FCC has classified I-VoIP Service as a Title II *telecommunications service*.                                          17

        A.      The FCC defines I-VoIP as a *telecommunications service* in the Order.                                    17

        B.      If an entity actually offers *telecommunications* for a fee directly to the public then it is a *telecommunications service*.        22

        C.      I-VoIP is a *telecommunications service*.                    28

D.    The FCC Open Internet Order analysis of Broadband Internet Access Service requires classification of I-VoIP as a *telecommunications service*.    33

II.    Classification of I-VoIP is a prerequisite to any reasoned analysis of the extension of Title II rights and obligations to I-VoIP.    34

A.    If the Court determines the FCC has not classified I-VoIP, it should vacate and remand the decision with instructions to classify I-VoIP as either a *telecommunications service* or an *information service*.    34

B.    Congress specified in the 1996 Act that classifications have consequences.    36

C.    The FCC refusal to classify I-VoIP in these circumstances is arbitrary and demonstrates a lack of reasoned decision-making.    38

III.    The FCC lacks authority to impart *number portability* rights obligations on entities that do not provide *telecommunications services*.    44

**A.**    Congress specifies that only *telecommunications service* carriers have the right to receive number ports and the duty to port numbers.    45

B.    FCC justifications for giving non-carriers the rights and obligations of a Title II common carrier lack merit.    48

[1]    Statutes are to be read as a whole since context matters.    48

[2]    The obligations of § 251(b)(2) conflicts with granting direct access to numbers.    50

[3]    The FCC's construction of § 251(e)(1) cannot be squared with the text of that subsection or the remainder of § 251 and the 1996 Act.    54

[4]    Section 251(e) gives the FCC exclusive jurisdiction over *telecommunications* numbering administration arrangements but not local *number portability*.    58

[5]    The FCC's prior expansions of *number portability* all involved entities classified as *telecommunications service* carriers.    60

vii

CONCLUSION CIRCUIT RULE 32(a)(2) ATTESTATION.................................62

CERTIFICATE OF COMPLIANCE.........................................................................63

CERTIFICATE OF SERVICE ...............................................................................64

ADDENDUM ...........................................................................................................65

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                          <u>Page</u>

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) .............................................35

*Adirondack Med. Center v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014)......................2

*American Trucking Associations, Inc. v. I.C.C.*, 697 F.2d 1146
    (D.C. Cir. 1983) ...................................................................................38 n.56

*AT&T Corp. v. F.C.C.*, 220 F.3d 607 (D.C. Cir. 2000) ......................................7 n.6

*Brown v. Gardner*, 513 U.S. 115 (1994) ................................................................57

*Capital Network Systems, Inc. v. F.C.C.,* 3 F.3d 1526 (D.C. Cir. 1993).........42 n.58

*\*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984)...............................................................2, 36, 49 n.64

*City of Arlington v. FCC*, 133 S.Ct. 1863 (2013) ....................................................45

*Corley v. United States,* 556 U.S. 303 (2009)...................................................49 n.63

*F.C.C. v. Fox Television Stations*, 556 U.S. 502 (2009) ..........................................54

*F.C.C. v. Midwest Video Corp.,* 440 U.S. 689 (1979)......................................42 n.58

*Illinois Bell Telephone Company. v. F.C.C.,* 883 F.2d 104
    (D.C. Cir. 1989) ...................................................................................42 n.58

*In re Dawes*, 652 F.3d 1236 (10th Cir. 2011) .................................................49 n.63
    *cert.denied*, 132 S. Ct. 2429 (U.S. 2012)

*\*In Re: FCC 11-161,* 753 F.3d 1015
    (10th Cir. 2014)..................................xvii, 4, 16, 23n.36, 26-28, 35, 38, 41, 62

*King v. St. Vincent's Hospital,* 502 U.S. 215 (1991) ......................................48 n.62

*\*Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355 (1986)...............45

*MCI Telecommunications Corporation v. AT&T*, 512 U.S. 218
(1994) .........................................................................................49 n.64, n.65

**\*National Association of Regulatory Utility Commissioners v. F.C.C.**, 525 F.2d
630 (D.C. Cir. 1976) ......................................................................31 n.45

*National Cable & Telecommunications Association v. Brand X Internet Services*,
545 U.S. 967 (2005) ...................................................................28, 42 n.58

*Nuvio Corp. v. F.C.C.*, 473 F.3d 302 (D.C. Cir. 2006). ...........................19 n.27, 43

*Pittston Coal Group v. Sebben,* 488 U.S. 105 (1988).....................................49 n.64

*Qwest Corp. v. F.C.C.,* 258 F.3d 1191 (10th Cir. 2001) ...................................7 n.6

*\*Russello v. United States*, 464 U.S. 16 (1993)......................................................57

*Texas Office of Public Utility Counsel v. F.C.C.,* 183 F.3d 393
(5th Cir. 1999). ....................................................................................48 n.61

*United States v. Midwest Video Corp.,* 406 U.S. 649 (1972) ........................42 n.58

*United States v. Southwestern Cable Co.,* 392 U.S. 157 (1968) ....................42 n.58

*\*Verizon v. F.C.C.*, 740 F.3d 623 (D.C. Cir. 2014)........................................50 n.66

*Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467 (2002) ........................7 n.6

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko*, *LLP,* 124 S. Ct.
872 *(2004)* .........................................................................................8 n.7

*Vonage Holdings Corp. v. F.C.C.*, 489 F.3d 1232 (D.C. Cir. 2007)................35, 42

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................54

28 U.S.C. § 2342(1) ....................................................................................1

28 U.S.C. § 2343 ........................................................................................1

28 U.S.C. § 2344 ..........................................................................................1

47 U.S.C. § 151 ........................................................................ xvii, 14, 17

47 U.S.C. § 152 ...................................................................................5 n.5

47 U.S.C. § 152 (§ 601(c) of the 1996 Act codified in notes) ...........5 n.5

47 U.S.C. § 153(11) ............................................................................... 26

47 U.S.C. § 153(16) ............................................................................. xvii

47 U.S.C. § 153(24) ............................................................................... 35

47 U.S.C. § 153(25) ........................................................................31 n.43

47 U.S.C. § 153(32) ............................................................... xviii, 5, 61

47 U.S.C. § 153(36) ........................................................................31 n.33

47 U.S.C. § 153(37) .................................................. 3, 6, 16, 45, 50, 53, 55

47 U.S.C. § 153(50) ..........................................................................28, 55

47 U.S.C. § 153(51) .............................................. 4, 16, 18, 24, 46, 49, 50, 55

47 U.S.C. § 153(52) ............................................................................... 29

47 U.S.C. § 153(53) ...................................................................4, 18, 28, 29, 35

47 U.S.C. § 153(54) ...........................................................................5, 29

47 U.S.C. §154(i) ...........................................................................41 n.57

47 U.S.C. §160 ..........................................................2, 8, 13, 37, 19 n.29

47 U.S.C. §§201-276 ......................................................................37 n.55

47 U.S.C. § 214 ............................................. 5, 24, 25, 26, 8 n.8, 27 n.40

47 U.S.C. § 226 ..............................................................................18, 32

47 U.S.C. § 251 ........................................ 6, 7, 13, 20, 21, 33, 43, 46, 54, 55, 58, 60

47 U.S.C. § 251(b) ................................ vii, 16, 46, 50, 51, 52, 55, 58, 60, 61

47 U.S.C. § 251(e) ............. vii, 5, 6, 9, 16, 39, 40, 41, 47, 48, 50, 54, 55, 56, 59, 60

47 U.S.C. § 252 ........................................ iv, 5, 6, 7, 9, 13, 20-22, 39, 43

47 U.S.C. § 253 ........................................ iv, 5 n.5, 9 n.11, 13, 22

47 U.S.C. § 254 ................................. 8 n.8, 25, 25 n.38, 26, 48 n.61, 57

47 U.S.C. § 261 ...............................................................................5 n.5

47 U.S.C. § 332(c) ................................................5 n.5, 9 n.11

47 U.S.C. § 402(a) ..............................................................................1

47 U.S.C. § 617(f) ...................................................................31 n.43

47 U.S.C. § 1302 ...................................................8 n.9, 29, 49

## Regulations

47 C.F.R. § 8.11(a)..................................................................30 n.43

47 C.F.R. § 8.2 .........................................................................30 n.43

47 C.F.R. § 9.3 .........................................................................30 n.43

47 C.F.R. § 52.15(g)(2)(i) .............................................................14

## Agency Decisions

*In the Matter of Numbering Policies for Modern Communications,*
30 F.C.C. Rcd. 6839 (2015), (***Order***) ........................................................
xxi, 1-6, 11-12, 14-18, 20-22, 24, 28, 38-41, 44, 48, 50-54,57 n. 74, 60-61

*In the Matter of Protecting & Promoting the Open Internet*,
30 F.C.C. Rcd. 5601 (2015),
(*Open Internet Order*)..............................................iii, 16, 30-34, 37, 49, 6

*In the Matter of Numbering Policies for Modern Communications*,
28 F.C.C. Rcd. 5842 (2013) ........................................................41 n. 51,

*In the Matter of Connect America Fund A National Broadband Plan for Our Future Establishing Just & Reasonable Rates for Local Exch. Carriers High-Cost Universal Serv. Support Developing an Unified Intercarrier Compensation Regime Federal-State Joint Board on Universal Service, Lifeline & Link-Up Universal Service Reform -- Mobility Fund*,
26 F.C.C. Rcd. 17663 (2011)
(*CAF Order*).............. xii, xvi, 23-25, 19 n. 27, 21 n.33, 23 n. 35, 24 n. 37, 25 n. 38

*In the Matter of IP-Enabled Services*,
24 F.C.C. Rcd. 6039 (2009) .........................................................12 n. 19

*In the Matter of Telephone Number Requirements for IP-Enabled Service Providers Local Number Portability Porting Interval & Validation Requirements IP-Enabled Service Telephone Number Portability Final Regulatory Flexibility Analysis Numbering Res. Optimization),*
     22 F.C.C.Rcd. 19531, 19541-43, ¶ 20 (2007)
     *(VoIP LNP Order)* ...............xviii, 4 n.3, 12 n. 20, 52 n. 69, 51, 52, 53, 54, 61

*In the Matter of Implementation of the Telecommunications Act of 1996: Telecommunications Carriers Use of Customer Proprietary Network Information and Other Customer Information IP-Enabled Services*,
     22 F.C.C. Rcd. 6927, 6956 (2007) .....................................................12 n. 19

*In the Matters of Appropriate Framework for Broadband Access to the Internet over Wireline Facilities Universal Serv. Obligations of Broadband Providers Computer III Further Remand Proceedings: Bell Operating Co. Provision of Enhanced Services; 1998 Biennial Regulatory Review -- Review of Computer III & ONA Safeguards & Requirements Conditional Petition of the Verizon Tel. Companies for Forbearance Under 47 U.S.C. 160(c),*
     20 F.C.C. Rcd. 14853 (2005)...............................................................37 n. 53

*In the Matters of IP-Enabled Services, E911 Requirements for IP-Enabled Service Providers*,
20 F.C.C. Rcd. 10245 (2005) ......................................................... xvii, 10 n. 15, 26

*In re Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 FCC Rcd 24011 (1998) ..........................................................29 n.41

*In the Matter of Federal-State Joint Board on Universal Service*, Report to Congress,
     13 F.C.C.R. 11501 (April 10, 1998) ...................................................30 n. 42

*In the Matter of Telephone Number Portability, Developing a Unified Intercarrier Compensation Regime*, 11 F.C.C. Rcd. 8352 (1996)........................................46, 51

**Miscellaneous**

*About the North American Numbering Plan* (Website) at

https://www.nationalnanpa.com/about_us/abt_nanp.html (last accessed March 29, 2016). ....................................................................................60 n. 75

*AT&T Corp. v. F.C.C*., No 15-1059, October 15, 2015 *Brief for Respondents* in the U.S. Court of Appeals for the D.C. Circuit, at p. 3, at: https://apps.fcc.gov/edocs_public/attachmatch/DOC-335731A1.pdf. ..........5, 5 n. 4

*Charter v MPUC - Defendants' Memorandum of Law In Support of Their Motion to Dismiss Plaintiffs' Complaint, at 4, filed November 20, 2015 in Charter Advanced Services, LLC, et. al., vs. Beverly Jones Heydinger, et. al., (D. Minn.) CASE NO. 15-cv-3935-SRN-HB.* .................................................................13 n. 22

Dodd, Annabel, *The Essential Guide to Telecommunications, at 18* (Prentiss Hall 2005) ........................................................................... xviii, 10 n. 13

*Local Telephone Competition: Status as of December 31, 2013, FCC, Wireline Competition Bureau, Industry Analysis and Technology Division*, at 3, (Oct. 16, 2014). ......................................................................................11, 11 n. 18

*...Michigan Bell Telephone Co. v Sprint Spectrum L.P. et al.; U.S.D.C.-W.D.Mich.; Case No. 14-416, appealing* Michigan Public Service Commission "Order" *In the matter of the petition of SPRINT SPECTRUM L.P. for arbitration pursuant to Section 252(b) of the Telecommunications Act of 1996 to establish interconnection agreements with MICHIGAN BELL TELEPHONE COMPANY, d/b/a AT&T MICHIGAN*. Case Nos. U-17349, U-17569. Issued April 15, 2014. .............13 n. 23

*February 26, 2016 Advice Letter No. 12725 from Hope Christman, Government Relations, Verizon (CPUC Utility Number U-1002C in response to General Order No. 171, D.15-12-005, to the Public Utilities Commission of the State of California.* ................................................................................................21 n. 34

*In Re: Application of Public Service Wireless, Inc. for Designation as an Eligible Telecommunications Carrier in the State of Georgia, Docket No. 35999, Document #152453 Order on Application for Designation as an ETC (March 20, 2014).* ..........................................................................................27 n.40

*In re: Application of Cox California Telcom, LLC (U5684C) for Designation as an ETC, Application 12-09-014*, Decision 12-10-002 (10/3/2013).....................27 n. 40

*In The Matter of Transworld Network, Corp. Petition For Designation as an Eligible Telecommunications Carrier Pursuant to §214(E)(2) of the Communications Act of 1934, as amended, 47 U.S.C. §214(E)(2), and 17.11.10.24 NMAC*, Before the New Mexico Public Regulation Commission, Case No. 11-00486-UT, FINAL ORDER (issued 20 February 2013). ...............................27 n.40

*Joint Universal Service Fund Reply Brief*, at 11-12, filed July 30, 2013, *In Re: FCC11-161*, 10th Circuit Case No. 11-9900 ...........................................25, 26

*Letter of William H. Weber, Cbeyond, et al, to FCC Secretary Dortch*, GN Docket No. 09-51, p. 1, filed Sept. 22, 2009 ...........................................20 n. 32

*Number Portability Administration Center – Number Portability* (Website) at https://www.npac.com/number-portability/what-is-lnp (last accessed March 29, 2016) ..........................................................................................................60 n. 76

Regitsky, Andrew, CCMI Blog: *Will Michigan IP Interconnection Decision be a Precursor for FCC?* Posted Jan 28, 2014, at: http://www.ccmi.com/blog/will-michigan-ip-interconnection-decision-be-a-precursor-for-fcc (last accessed March 3, 2016). .....................................................................................................14 n. 24

Weiser, Philip, *Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U.L.Rev. 1692 (2001)..............................8

**\*Authorities upon which Petitioner chiefly relies are marked with an asterisk.**

# <u>GLOSSARY</u>

| | |
|---|---|
| ***Act*** | ***Communications Act of 1934, as amended*** |
| | 47 U.S.C. §§ 151 *et seq.* |
| ***1996 Act*** | ***Telecommunications Act of 1996*** |
| | Pub. L. No. 104-104, 110 Stat. 56 (1996) |
| ***CAF Order*** | ***November 2011 Connect America Fund Order — which failed to get 10th Circuit agreement that a new term "voice telephony"- which included I-VoIP — was not a telecommunications service.*** |
| | *In re: Connect Am. Fund—Transformation Order (CAF Order),* 26 FCC Rcd. 17663 (2011), <u>aff'd</u> <u>sub</u> nom. *In re: FCC,* 753 F.3d 1015 (10th Cir. 2014), <u>pet.</u> <u>for</u> <u>cert.</u> <u>denied</u> *NARUC v. F.C.C.*, 135 S. Ct. 2072 (2015). |
| ***CLEC*** | ***Competitive Local Exchange Carrier*** |
| ***CPE*** | ***Customer Premises Equipment*** |
| | 47 U.S.C. § 153(16) — "[E]quipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications." |
| ***FCC*** | ***Federal Communications Commission*** |
| | 47 U.S.C. § 151 (1934). |
| ***IP*** | ***Internet Protocol*** |
| | <u>See,</u> comparative description under TDM, *infra*. |
| ***I-VoIP*** | ***Interconnected Voice over Internet Protocol*** |
| | Retail phone service, i.e., offering telecommunications to the public for a fee using IP protocol instead of Time |

Division Multiplexing (TDM) defined in the FCC's rules in 2005: ("(1) the service enables real-time, two-way voice communications; (2) the service requires a broadband connection from the user's location; (3) the service requires IP-compatible CPE; and (4) the service offering permits users generally to receive calls that originate on the PSTN *and* to terminate calls to the PSTN.") *In the Matters of IP-Enabled Services, E911 Requirements for IP-Enabled Service Providers*, 20 F.C.C. Rcd. 10245, 10257 (2005)

| | |
|---|---|
| *LEC* | *Local Exchange Carrier* |

47 U.S.C. § 153(32) (1934)

| | |
|---|---|
| *Order* | *Order on Review - grants direct access to numbers to I-VoIP providers and includes portability obligations.* |

Report and Order, *In the Matter(s) of Numbering Policies for Modern Communications*, WC Docket 13-97, *IP-Enabled Services*, WC Docket 04-36, *Telephone Number Requirements for IP-Enabled Services Providers*, WC Docket 07-243, *Telephone Number Portability*, CC Docket 95-116, *Developing a Unified Intercarrier Compensation Regime*, CC Docket 01-92, *Connect America Fund*, WC Docket 10-90, *Numbering Resource Optimization*, CC Docket 99-200, FCC 15-70, 30 F.C.C. Rcd. 6839, (rel. June 22, 2015)

| | |
|---|---|
| *PSTN* | *Public Switched Telecommunications Network* |

This is not a term defined anywhere in U.S. legislation. *Newton's Telecom Dictionary, 18th Ed*, at 596, says: "an abbreviation used by the [International Telecommunications Union]. PSTN simply refers to the local, long distance and international phones system which we use every day. In some countries, it's only one phone company. In countries with competition, e.g., the United States, PSTN refers to the entire interconnected

xvii

collection of local, long distance, and international phone companies, which could be thousands."

| | |
|---|---|
| **TDM** | ***Time Division Multiplexing*** |

"Time division multiplexing is a digital multiplexing scheme that saves capacity for each device or voice on a telephone call. Once a connection is established, capacity is saved even when the device is not sending information. For example, if a call is put on hold, no other device can use this spare capacity. Small slices of silence with thousands of calls in progress in carriers' networks result in high amounts of unused capacity. This is the reason time division multiplexing is not as efficient as newer technologies such as Voice over IP, in which voice and data are interspersed whenever possible. Both T-1 and T-3 use time division multiplexing . . . T-3 is used for very large customers and Internet service provider networks . . . T-1 is lower in cost and capacity… allows 24 voice, video, and/or data conversations to share one path. It is the most common form of multiplexing at end user organizations. T-1 applications include linking organization sites together for voice calls, Internet access, and links between business customers and telephone companies . . . [S]mall organizations . . . frequently use one T-1 circuit for both Internet access and voice calling." Dodd, Annabel*, The Essential Guide to Telecommunications 4ᵗʰ Ed., at 18* (Prentiss Hall 2005).

| | |
|---|---|
| ***VoIP LNP Order*** | ***2007 FCC Order Formalizing I-VoIP Relationship With State Certificated Carriers.*** |

*In the Matter of Telephone Number Requirements for IP-Enabled Service Providers Local Number Portability Porting Interval & Validation Requirements IP-Enabled Service Tel. No. Portability Final Regulatory Flexibility Analysis Numbering Res. Optimization),* 22 F.C.C. Rcd. 19531 (2007).

xviii

## STATEMENT OF JURISDICTION

The ***Order*** is a final order appealable under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1).  The Commission is a proper respondent under FRAP 15(a), and the United States under 28 U.S.C. § 2344.  Venue is proper under 28 U.S.C. § 2343.  The ***Order*** was published October 29, 2015 at 80 Federal Register 66454.  The Petition was filed December 23, 2015 within 60 days.

## STATEMENT OF THE ISSUES

1.   Whether portions of the FCC ***Order*** are inconsistent with the plain text of the statute, arbitrary and capricious, beyond the FCC's jurisdiction, and abuse of discretion or otherwise not in accordance with the law?

2.   Whether the FCC has classified I-VoIP service as a *telecommunications service*?

3.   Whether an I-VoIP provider can be deemed to be a *telecommunications carrier* without actually providing *telecommunications* for a fee directly to the public?

4.   Whether the FCC can deem I-VoIP a *telecommunications service* in its regulations, yet exempt the provider from all other Title II obligations without conducting a forbearance analysis under 47 U.S.C. § 160?

1

5.    Whether classification is a pre-requisite to any analysis of the application of Title II rights and obligations to an unclassified carrier?

6.    Whether the FCC lacks authority to impart *number portability* rights or obligations or permit direct access to numbers by entities that do not provide *telecommunications services*?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum.

## STANDARD OF REVIEW

Under *Chevron*, agencies are not entitled to deference where a court, after "considering the text, structure, purpose, and history of an agency's authorizing statute," can "determine [that] a provision reveals congressional intent about the precise question at issue." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696 (D.C. Cir. 2014). Moreover, an agency "interpretation of a statute is not entitled to deference when it goes beyond the meaning the statute can bear." *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 229 (1994) (citing *Pittston Coal Group v. Sebben,* 488 U.S. 105, 113 (1988); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-843 (1984)).

# PRELIMINARY STATEMENT

The *Communications Act of 1934* (Act), 47 U.S.C. §§ 151 *et seq.*, as amended by the *Telecommunications Act of 1996* (1996 Act), Pub. L. No. 104-104, 110 Stat. 56, defines "*number portability*" as "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers . . . when switching from one telecommunications carrier to another." 47 U.S.C. § 153(37).

Prior to the ***Order***,[1] *number portability* always involved the "port" of a number from one "*telecommunications carrier*" to another "*telecommunications carrier.*" Interconnected Voice-Over-Internet-Protocol (I-VoIP) providers only were assigned phone numbers as customers of those "*carriers.*" Every time an I-VoIP "*user*" requested *number portability*, the port involved a State-regulated carrier on both ends of the porting transaction.

In the ***Order***, the Federal Communications Commission (FCC) for the first time (i) permits the direct assignment of phone numbers to non-carrier I-VoIP providers and (ii) requires *carriers* to port numbers to I-VoIP providers that are not *carriers*, lack the same obligations and rights of those *carriers*, and are not State-regulated. ***Order***, ¶ 55 (J.A. __)

---

[1]     *In the Matter of Numbering Policies for Modern Communications,* Report and Order, 30 F.C.C.Rcd. 6839 (2015), (***Order***) (J.A. __ - __).

3

Ignoring 10th Circuit precedent,[2] and the text of the ***Order's*** implementing rules, the FCC creates this porting obligation while <u>claiming</u> it still has not classified I-VoIP providers as "*telecommunications carriers*"   (47 U.S.C. § 153(51)) or their services as "*telecommunications services*."  47 U.S.C. § 153(53). ***Order****,* ¶ 82 (J.A. __).

For over 12 years, the FCC has assiduously avoided placing I-VoIP providers within any statutory classification, refusing to recognize whether they are *telecommunications carriers* or instead are providing an "*information service*" — all while allowing them to operate in deregulated space between the lines of the statute.

The ***Order*** not only avoids clear Congressional limits on the FCC's statutory authority, but also undermines tasks Congress allocated to States, which are generally based on a State's ability to regulate *telecommunications carriers*.[3]

---

[2]      *In Re: FCC11-161,* 753 F.3d 1015 (10th Cir. 2014). <u>See</u>, discussion, *infra* at 24-28.

[3]      *In the Matter of Telephone Number Requirements for IP-Enabled Service Providers Local Number Portability Porting Interval & Validation Requirements IP-Enabled Service Telephone Number Portability Final Regulatory Flexibility Analysis Numbering Res. Optimization),* 22 F.C.C. Rcd. 19531, 19541-43, ¶ 20 (2007) *(VoIP LNP Order)* ("We emphasize that ensuring compliance with the" [Local Number Portability] requirements "remains the responsibility of the [State-certificated] carrier that obtains the numbering resource from the numbering administrator" as well as the responsibility of the I-VoIP provider.) (emphasis added).

As the FCC pointed out in a recent brief:[4]

> VoIP providers of all kinds typically must partner with, and compensate, a local exchange carrier to offer VoIP telephone service to customers. They do this to obtain telephone numbers for the VoIP provider's customers, and to obtain interconnection arrangements with other local and interexchange (long distance) carriers.

A "*local exchange carrier*" is a provider of "*telephone exchange service*". See, 47 U.S.C. §§ 153(32) and 153(54).  *Telephone exchange service* has been subject to State regulation since 1934.

47 U.S.C. § 152(b).  The 1996 Act expressly continued that State oversight.  47 U.S.C. §§ 214(e) and 252.  Moreover, all other federal reservations of State authority[5] to, *inter alia*, address customer service quality, promote universal service, and protect competitive entry by providing backstop arbitrations for interconnection negotiations, are linked to carriers offering *telecommunications services.*

The ***Order*** relies exclusively on 47 U.S.C. § 251(e)(1) for authority.  But that Section makes no mention of *number portability*.  It only discusses creating

---

[4]    October 15, 2015 *Brief for Respondents* in the U.S. Court of Appeals for the D.C. Circuit, *AT&T Corp. v. F.C.C*., No 15-1059, at p. 3, at: https://apps.fcc.gov/edocs_public/attachmatch/DOC-335731A1.pdf.

[5]    See, 47 U.S.C. §§ 152(b)&(c), 251(d)(3), 261(b)&(c), 252(e)(3), 253(b)&(c), 332(c), and 601(c) of the 1996 Act, as codified in notes to 47 U.S.C. § 152.

impartial entities to "administer" numbers.  Recognizing this flaw, the FCC argues that: "Nothing in section 251(e)(1) limits access to numbers to 'telecommunications carriers' or 'telecommunications services,'" ***Order***, ¶ 78 (J.A.__).  But the § 153(37) definition of *number portability* does - plainly limiting portability rights and obligations to "*users* of *telecommunications services*" and "*telecommunications carriers*."  As the ***Order*** acknowledges, where "Congress wanted to limit certain rights and obligations just to telecommunications carriers or telecommunications services, it knew how to do so."  ***Order***, ¶ 80 (J.A. __).  And Congress did just that in § 153(37), a statutory provision the FCC cites but never addresses directly in the ***Order***.  The view that *number portability* can only be ordered to port *telecommunications services* from one *telecommunications carrier* to another, and that direct access to numbers is limited to *telecommunications carriers*, is also consistent with § 251(e)(2)'s requirement that the costs of both "*numbering administration*" <u>and</u> "*number portability*" be borne by "*telecommunications carriers*."  Although pulling at just one thread, the ***Order*** may well unravel the fabric of the Act and eviscerate the role assigned States to protect competition and consumers.

Carrier rights to, <u>e.g.</u> nondiscriminatory interconnection and intercarrier compensation under §§ 251 and 252 rely upon the fact that such arrangements take place between regulated *telecommunications carriers*.  If non-carriers obtain direct

access to numbers, the FCC will cripple the §§ 251-52 framework, a framework in which State Commissions play an integral role as the arbiter of carrier-to-carrier disputes and the sounding board for consumer complaints. That framework relies on telecommunications traffic passing between regulated *telecommunications carriers* offering *telecommunications services*. By departing from the Act's *number portability* requirements, the FCC has not just skirted classifying I-VoIP, but also is undermining the competitive goals of the Act.

## STATEMENT OF THE CASE

> [Courts] must respect the role of the Legislature, and take care not to undo what it has done. A fair reading of legislation demands a fair understanding of the legislative plan. *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015).

The legislative plan of the 1996 Act is not difficult to discern.

Congress set up a carefully designed structure to enhance competition among "*telecommunications service*" carriers - seeking to "introduce competition to local telephone markets" while simultaneously "preserving universal service."[6]

---

[6]     *Qwest Corp. v. FCC,* 258 F.3d 1191, 1196 (10th Cir.2001); See also, *AT&T Corp. v. FCC*, 220 F.3d 607, 611 (D.C. Cir. 2000), (the 1996 Act "fundamentally restructured *local telephone markets*" and "sought to eliminate the barriers that [competing carriers] faced in offering *local telephone service. (emphasis added))*; *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 467 (2002) (The Act meant "to foster competition between monopolistic carriers providing local telephone service and companies seeking to enter local markets.")

The Act requires the FCC to work hand-in-glove with State Commissions to open local markets to competition,[7] to "preserve and advance universal service,"[8] and to encourage deployment "of advanced telecommunications to all Americans."[9]

The Act defines retail phone service as "*telecommunications service*" in specific and functional terms as "offering of telecommunications for a fee directly to the public . . . regardless of the facilities used."[10] Providers classified as offering *telecommunications services* for a fee have access to privileges and must comply with mandatory requirements under Title II of the Act.

However, the FCC, if it can make certain findings, can forbear from applying those requirements. 47 U.S.C. § 160.

---

[7]    See, e.g., *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko*, LLP, 124 S. Ct. 872 at 876, 882 (2004); *Weiser, Philip, Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U.L.Rev. 1692, 1694 (2001) (describing the 1996 Act as "the most ambitious cooperative federalism regulatory program to date"). See, § 252(e) (requiring State approval of all interconnection agreements between incumbent local exchange and competitive carriers).

[8]    See, 47 U.S.C. § 254 (f) (State universal service programs), § 214(e), (States designate *telecommunications carriers* to receive federal subsidies, § 251(f) (States can exempt rural *carriers* from certain Title II requirements.)

[9]    See, 47 U.S.C. § 1302(a) which specifies the FCC and each State Commission "with regulatory jurisdiction over telecommunications services" "shall encourage" the deployment of advanced telecommunications capability.

[10]    47 U.S.C. § 153(53).

While Congress was pursuing a more deregulatory approach, there is no question that it retained specific protections for the retail phone customers of Title II *telecommunications services* and for competition.

Many of those protections reside with States.[11]

"*Telecommunications carriers" or "carriers,*" defined as those providing "*telecommunications services,*"[12] must contribute to, and can seek subsidies from, a federal universal service fund. 47 U.S.C. § 254. They must pay for "*numbering administration*" and "*number portability*." But they have direct access to numbers, the right to have numbers ported to them by other *carriers*, and the duty to port to other *carriers*. 47 U.S.C. § 251(e).

Their customers are protected by State service quality and universal service requirements. Competing *"local exchange carriers"* (*LECs*) seeking to interconnect with incumbents *(Incumbent LECs)*, are entitled to a State arbitration if negotiations fail. 47 U.S.C. § 252.

---

[11]    The single most preemptive provision in the Act, added in 1996, is 47 U.S.C. § 253. But § 253 also preserves protections for customers of *telecommunications services* by allowing States to impose "on a competitively neutral basis . . . requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." Compare, § 332(c), State authority to regulate "other terms and conditions" of commercial mobile services; See, also note 5, *supra*.

[12]    47 U.S.C. § 153(51). The term encompasses *local exchange carriers*. 47 U.S.C. § 153(32).

The telephone network has gone through several technology transitions. The most recent is the ongoing shift from Time Division Multiplexed (TDM) data packets to Internet Protocol data packets — which includes I-VoIP service. TDM predates the 1996 Act. A T-1 link uses TDM to allow 24 voice, video, and/or data conversations to share the same path.[13] But TDM is not as efficient as new technologies like VoIP in which voice and data are interspersed whenever possible, rather than, as in TDM, at timed intervals.[14]

In 2005, the FCC created a definition that has persisted through today.[15] The definition was a specific class of VoIP services the FCC labeled "interconnected VoIP."

As the definition indicates, Interconnected VoIP (I-VoIP) is a telephone service that allows you to make a real-time two-way voice call to any person or business by using a phone number.[16]

---

[13]    Dodd, Annabel, *The Essential Guide to Telecommunications, Fourth Edition, at 18* (Prentiss Hall 2005).

[14]    Id.

[15]    See, *In the Matters of IP-Enabled Services, E911 Requirements for IP-Enabled Service Providers*, 20 F.C.C. Rcd. 10245, 10257 (2005) (Finding I-VoIP "enables real-time, two-way voice communications;" "requires a broadband connection from the user's location;" "requires IP-compatible CPE;" and "permits users generally to receive calls that originate on the PSTN *and* to terminate calls to the PSTN.")

[16]    Id.

Or what everyone but the FCC (and those seeking to avoid State oversight and Title II restrictions) might call *retail telephone service*.[17]

Actually, the FCC <u>also</u> labels them *retail telephone services* in its regular Local Telephone Competition reports, and in the **Order**, points out there are "nearly 48 million interconnected VoIP *retail local telephone service* connections" as of the end of 2013 which comprise "over a third of all wireline *retail local telephone service* connections."[18]  The other two-thirds of these *retail local telephone service providers* are classified by the FCC, as Congress intended, as *telecommunications carriers* subject to the privileges and the burdens of Title II.

I-VoIP providers have no classification.

The FCC cannot bring itself to classify I-VoIP service - a service that,

- on its face, meets the definition of *telecommunications service,*

- competes head-to-head against *telecommunications carriers* to provide *retail telephone service*, and that

---

[17]    <u>Id</u>. (describing I-VoIP as "a service that enables a customer to do everything . . . the customer could do using an analog telephone." (footnote omitted))

[18]    **Order**, ¶ 1, cites *Local Telephone Competition: Status as of December 31, 2013, FCC, Wireline Competition Bureau, Industry Analysis and Technology Division*, at 3, (Oct. 16, 2014).

11

- according to the FCC, consumers perceive offers the <u>same</u> functionalities as TDM-based phone service."[19]

Yet the FCC has no difficulty in the current ***Order***, and on at least four prior occasions, extending piecemeal "certain Title II obligations to interconnected VoIP providers"[20] — based on those *same* characteristics:  The agency required in May 2005, working 911 service, in June 2006, universal service contributions, in March 2007, customer proprietary network information protections, and in June 2007, disability access and deaf relay services.[21] All four are Title II duties Congress imposes on *telecommunications carriers*.

---

[19]     <u>See</u>, <u>e.g.</u>, *In the Matter of IP-Enabled Services*, 24 F.C.C. Rcd. 6039, 6046 (2009), ("From the perspective of a customer making an ordinary telephone call, we believe that interconnected VoIP service is functionally indistinguishable from traditional telephone service."); *In the Matter of Implementation of the Telecommunications Act of 1996: Telecommunications Carriers Use of Customer Proprietary Network Information and Other Customer Information IP-Enabled Services*, 22 F.C.C. Rcd. 6927, 6956 (2007) (finding "these services, from the perspective of a customer making an ordinary telephone call, are virtually indistinguishable").

[20]     *VoIP LNP Order*, 22 F.C.C.Rcd. 19538-39, ¶14 (2007).

[21]     <u>Id</u>.

This refusal to classify continues to require States to litigate the application to I-VoIP carriers of State service quality standards preserved in § 253(b).[22]  States have also been involved in requests for arbitrations of VoIP interconnection agreements under § 251-2[23] that have been resisted because of I-VoIP's unresolved status. Classification will resolve whether § 251-2 protections apply.  If the FCC finds market conditions warrant limiting those rights, it has the option to forbear under § 160.

In lieu of resolution, the FCC encouraged parties to negotiate while it continues to contemplate whether there actually are any interconnection rights. As one analyst recently observed, the FCC:

---

[22]     <u>See</u>, *Defendants' Memorandum of Law In Support of Their Motion to Dismiss Plaintiffs' Complaint, at 4, filed November 20, 2015 in Charter Advanced Services, LLC, et. al., vs. Beverly Jones Heydinger, et. al.,* (D. Minn.) CASE NO. 15-cv-3935-SRN-HB. (Charter unilaterally transferred all Minnesota residential consumers to Charter Advanced, an unregulated affiliate which lacks authority from the State Commission to provide *telecommunications service* in Minnesota. Charter Advanced argues "its customers are no longer entitled to the benefits of state-law consumer safeguards.")

[23]     AT&T's Brief on the Merits, at p. 114-15, filed June 26, 2014 in the case captioned: *Michigan Bell Telephone Co. v Sprint Spectrum L.P. et al.; U.S.D.C.-W.D.Mich.; Case No. 14-416, appealing* Michigan Public Service Commission "Order" *In the matter of the petition of SPRINT SPECTRUM L.P. for arbitration pursuant to Section 252(b) of the Telecommunications Act of 1996 to establish interconnection agreements with MICHIGAN BELL TELEPHONE COMPANY, d/b/a AT&T MICHIGAN.* Case Nos. U-17349, U-17569. Issued April 15, 2014. http://www.dleg.state.mi.us/mpsc/orders/comm/2014/u-17569_4-15-2014.pdf.

13

[F]ailed to provide sufficient guidance. It has stated that it expects carriers to negotiate in good faith but it has failed to adopt actual rules. Thus lacking specific FCC direction, disagreements between [Incumbent Local Exchange Carriers] and [Competing Local Exchange Carriers] concerning IP interconnection are steadily increasing and State commissions are becoming involved.[24]

In 2011, the FCC, again stated it was unwilling to classify I-VoIP services, but wanted to allow such carriers another Title II benefit - access to universal service subsidies. On appeal, the Court disagreed noting that the Act limits access to such subsidies to *telecommunications carriers*.[25]

This should have ended the classification controversy.

But, in 2015, the FCC issued the ***Order***, again claiming that it could not classify the service.

Respectfully, 47 U.S.C. § 151 requires the FCC to "execute and enforce the provisions of this chapter."  It has a fully developed record dating back to 2002. The law is clear. There is no legitimate reason for continued agency inaction.

## The Order

Current 47 C.F.R. 52.15(g)(2)(i) limits access to phone numbers to entities that demonstrate they are authorized to provide service. The FCC interpreted this

---

[24]    Regitsky, Andrew, CCMI Blog: *Will Michigan IP Interconnection Decision be a Precursor for FCC?* (Jan 28, 2014): http://www.ccmi.com/blog/will-michigan-ip-interconnection-decision-be-a-precursor-for-fcc (last accessed March 3, 2016).

[25]    See, note 2, *supra*.

rule as requiring a State certificate or FCC license. Practically, only *telecommunications carriers* are able to provide the proof of authorization required to obtain numbers directly. *Order*, ¶ 4 (J.A. __).

Given I-VoIP's lingering indeterminate classification, many State certificated/regulated *carriers* are adjusting their operations by creating an unregulated I-VoIP affiliate.[26]

On April 18, 2013, the Commission adopted the *Direct Access Notice of Proposed Rulemaking* which, among other things, proposed to allow I-VoIP providers to obtain numbers directly from the Numbering Administrators. Id. at ¶ 5 (J.A. __).  The **Order** provides an alternate federal license as a basis to get direct access to numbers. **Order**, ¶¶ 22-24 (J.A. __).  This requirement is consistent with the prior rule — assuming of course the license applicant is a *telecommunications carrier*.

Without classifying I-VoIP providers, the **Order** provides them with the benefit of direct access to numbers and imposes portability burdens upon them.

The FCC specifies in the **Order** at ¶ 82, that it is not classifying I-VoIP, but then in the implementing rules, it specifically defines I-VoIP as a *telecommunications carrier* using definitional text from the Act. 30 F.C.C.Rcd. 6888.

---

[26]    See, note 22, *supra.*

## ARGUMENT SUMMARY

The FCC <u>claims</u> it did not classify I-VoIP service as a *telecommunications service*, but its' implementing regulations giving I-VoIP providers direct access to numbers/portability do just that.  An entity cannot "be deemed" to be a *telecommunications carrier* unless it is offering a service that conforms to the Act's definition.  In 2011, the 10th Circuit rejected a similar FCC analysis.  *In Re: FCC 11-161*, 753 F.3d 1048.

An offering is a telecommunications service "by virtue of its functions."  I-VoIP functions match the Act's definition of telecommunications services.  The analysis in the *Open Internet Order*, 30 F.C.C. Rcd. 5601*,* confirms this. Note for the Court to rule otherwise, *as if* the FCC actually had classified I-VoIP as an *information service*, would require it to address a legal question before a concrete issue is presented for review.

Section 251(e)'s grant of "exclusive jurisdiction" over part of the North American Numbering Plan and the requirement to make numbers "available on an equitable basis" must be read in conjunction with § 251(e)(2), which requires that the costs of number administration and portability be borne by "all telecommunications carriers." The broader power to administer numbers cannot be applied in a way that conflicts directly with the more specific requirements and duties specified in §§ 251(b), 251(e), 153(37), and 153(51).

16

## STATEMENT OF STANDING

Petitioner participated in the proceedings below and has standing because the *Order* undermines its members' authority directly and indirectly.

## ARGUMENT

**I.    The FCC has classified I-VoIP Service as a Title II Telecommunications service.**

> **A.    The FCC defines I-VoIP as a telecommunications service in the Order.**

In the ***Order***, at ¶ 83(J.A.___), the FCC purports to continue its 12-year evasion of its § 151 duty to "enforce the provisions" of Title II that protect consumers and competition.  There the agency <u>claims</u> once again that it "finds it unnecessary to first determine the classification of interconnected VoIP service, and declines to do so."

However, the FCC's claim conflicts directly with its simultaneous specifications in the appended implementing rules — which state:

> (e)    *Service provider*. The term "*service provider*" refers to a telecommunications carrier or other entity that receives numbering resources from the NANPA [North American Plan Administrator], a Pooling Administrator or a telecommunications carrier *for the purpose of providing or establishing telecommunications service*. For the purposes of this part, the term "service provider" includes an interconnected VoIP service provider.

17

(i)     *Telecommunications   carrier   or   carrier*.   A "telecommunications carrier" or "carrier" *is <u>any provider  of  telecommunications  services</u>* <u>except that such term does not include aggregators of telecommunications services (as defined in 47 U.S.C. 226(a)(2))</u>. . . . For the purposes of this part, the term "telecommunications carrier" or "carrier" includes an interconnected VoIP service provider.

(j)     *Telecommunications      service*.      The      term "telecommunications service" refers to the <u>offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used</u>. For purposes of this part, the term "telecommunications service" includes interconnected VoIP service

*Order*, at p. 6888 (J.A.___) (emphasis added).

It is difficult to discern any meaningful difference between these definitions and the definitions for the same terms Congress included in the 1996 Act.

Indeed, the <u>underlined</u> portions in the definitions listed above for (i) "*telecommunications carrier*" are identical to the definition of that term found in § 153(51); and also for (ii) "*telecommunications service*" are identical to text in § 153(53).

This is not a surprise, as the FCC has acknowledged both directly[27] and indirectly,[28] that consumers purchasing retail phone service have similar difficulties discerning the difference between the "unclassified" service provided by I-VoIP providers and service from Title II *telecommunications carriers*.

And anyone familiar with 1996 Act's mechanisms for promoting local competition, might have similar difficulty understanding the FCC's actions. Actions which effectively blocked for more than 12 years crucial competition and consumer protections by failing to classify a very carefully defined service that is indistinguishable from functionally equivalent competing Title II *telecommunications services*.[29] Any rational examination of the law leads to the inevitable conclusion that I-VoIP is a *telecommunications service*.

---

[27]    *In the Matter of Connect America Fund A National Broadband Plan for Our Future Establishing Just & Reasonable Rates for Local Exch. Carriers High-Cost Universal Serv. Support Developing an Unified Intercarrier Compensation Regime Federal-State Joint Board on Universal Service, Lifeline & Link-Up Universal Service Reform -- Mobility Fund*, Rcd. 17663, 17685 (2011) (*CAF Order*) (I-VoIP services "allow customers to make real-time voice calls to, and receive calls from, the PSTN, and increasingly appear to be viewed by consumers as substitutes for traditional voice telephone services.") Compare, *Nuvio Corp. v. F.C.C.*, 473 F.3d 302, 303 (D.C.Cir. 2006) ("From a caller's perspective, interconnected VoIP service is, for the most part, similar to traditional telephone service, and its users reasonably expect it to function the same.")

[28]    See, discussion, *supra*.

[29]    The Act does treat carriers with more market power differently. But § 160 allows the FCC to forbear from those provisions when they are no longer required.

But the FCC's approach displays a purposeful disregard of the Congressional scheme and lack of reasoned decision-making. There can be no question of what Congress intended. Yet the FCC's recalcitrance, assures that competition/competitive entry has less protection if I-VoIP services are involved.

The FCC consistently acknowledges that interconnection, particularly for I-VoIP,[30] is vital for competition:

> Interconnection among communications networks is critical given the role of network effects. Historically, interconnection among voice communications networks has enabled competition and the associated consumer benefits that it brings through innovation and reduced prices.[31]

Certainly, Congress thought so or else why would it have established the § 251-2 backstop arbitration procedure for new entrants. I-VoIP providers have been seeking interconnection with incumbents since at least 2009.[32]

---

[30]    **Order**, ¶ 63 ("VoIP interconnection is an important element in completing the transition from TDM to IP networks and services.")

[31]    *CAF Order,* 26 F.C.C. Rcd. 18044, ¶ 1009.

[32]    *Letter of William H. Weber, Cbeyond, et al, to FCC Secretary Dortch*, GN Docket No. 09-51, p. 1, filed Sept. 22, 2009, explaining that, instead of agreeing to interconnect and exchange IP-traffic, major incumbent LECs require competing carriers to convert traffic to TDM prior to delivery, even where the LEC itself has deployed facilities that could transport the traffic in IP-packets on its own network — thereby increasing costs and reducing service quality.

But the FCC, after taking comment on the applicability of § 251-2 to I-VoIP, finally decided, in 2011,[33] not to decide.  Instead, it "encouraged" all IP-based carriers to negotiate interconnection agreements while it continued to ponder.

Fast forward to last June, and the FCC kicked the can down the road again, noting in the ***Order*** at ¶ 50 (J.A.__):

> [W]hile we anticipate an increase in VoIP interconnection arrangements once interconnected VoIP providers are authorized to access numbers directly, we decline to mandate those arrangements, as the Commission is currently considering the appropriate policy framework for VoIP interconnection.

Competitors using older digital technology that seek to interconnect to large incumbent *carriers*, retain access to mandatory State § 252 arbitrations if negotiations fail.  But providers seeking to connect on an IP basis with the same carriers cannot.  It's been at least seven years since carriers have sought IP interconnection, and well over four years since the first FCC non-decision on the topic — and the results have been predictably bad.[34]   Moreover, carriers are

---

[33]     *CAF Order,* 26 F.C.C. Rcd. 18153 n. 14.

[34]     *February 26, 2016 Advice Letter No. 12725 from Hope Christman, Government Relations, Verizon (CPUC Utility Number U-1002C in response to General Order No. 171, D.15-12-005, to the Public Utilities Commission of the State of California,*("Letter advises that Verizon Services has entered eleven multistate agreements for the exchange of  IP voice traffic (I-VoIP). Six of the eleven Multistate IP Agreements have not been implemented. There are no facilities or arrangements in place to allow for traffic exchange. With the other five, Verizon ILECs and affiliates are exchanging voice traffic in IP.)

prejudiced when I-VoIP providers do sign interconnection agreements with the largest carriers because other carriers cannot opt into them pursuant to 47 U.S.C. § 252(i).

If this Court holds that I-VoIP is a *telecommunication service*, the backstop arbitrations would be available immediately. The FCC would retain the option to forbear from application of § 252 if deemed necessary.

Congress was also clear, even in the most preemptive provision of the Statute § 253, that customers should continue to have State service quality protections. But the FCC's recalcitrance also assures that customers of I-VoIP services have fewer State protections.

As a matter of federal law, customers of carriers that have not updated their systems to I-VoIP remain subject to State service quality and other protections — as long as they are applied in a "competitively neutral fashion," but their direct I-VoIP competitors - do not. On its face, it's not what Congress specified and it's not a rational policy. And it certainly doesn't sound "competitively neutral."

## B. *If an entity actually offers telecommunications for a fee directly to the public then it is a telecommunications service.*

Whatever the Court's view of the logic, or lack thereof, underlying the *Order*, the statutory text is clear. An entity cannot "be deemed" or volunteer/consent to be a *telecommunications carrier*, unless that entity - in the words of the statute (and the FCC's rules) — is <u>actually</u> <u>offering</u>

22

"telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, <u>regardless of the facilities used.</u>"

Carriers are either offering a service that matches the characteristics of this functional definition or they are not.

And if one is, then, absent a forbearance proceeding, <u>*all*</u> of Title II obligations apply to that carrier's service.

The FCC conducted no forbearance proceeding here.

The FCC tried something similar in 2011 in the so-called *Connect America Fund* (*CAF*) proceeding.[35]

There, as here, the FCC <u>*claimed*</u> that it had not decided the regulatory classification of I-VoIP services and that the 1996 Act's classification scheme was irrelevant to whether carriers could be designated to receive federal universal service funding:

> Our authority to promote universal service in this context does not depend on whether interconnected VoIP services are telecommunications services or information services under the Communications Act.

<u>Id</u>. at 17685

The Tenth Circuit disagreed.[36]

---

[35]     *CAF Order,* 26 F.C.C. Rcd. 17663 (2011).

[36]     *In re: FCC,* 753 F.3d 1015, 1048 (10th Cir. 2014).

As with the ***Order***, the FCC's statement that it had not decided VoIP's classification was directly at odds with the explicit requirements in the *CAF Order.*

In the CAF proceeding, the FCC specified that providing I-VoIP *services* can be the <u>sole</u> basis for qualifying for federal universal service subsidies.[37]

However, the Act is crystal clear that <u>only</u> a provider of *telecommunications services* can qualify for subsidy.

47 U.S.C. § 214(e)(1) states that only *common carriers* designated as *eligible telecommunications carriers* can receive federal universal service support. Therefore, the qualifying I-VoIP service the *CAF Order* specifies must be a *telecommunications service* — for two reasons.  First, qualifying carriers, under § 214, are designated eligible *telecommunications carriers or ETCs*.  The term *telecommunications carriers* is defined at 47 U.S.C. § 153(51) as "any provider of telecommunications services."  Second, 47 U.S.C. § 153(51) specifies that a carrier "shall be treated as a common carrier under this chapter only to the extent it is engaged in providing telecommunications services."  Section 214(e) is in "this chapter."  Necessarily, therefore, common carriers can only be treated as having that status under § 214(e) "to the extent they are engaged in providing telecommunications services."

---

[37]    *CAF Order,* 26 F.C.C. Rcd. 18199 ("An eligible telecommunications carrier must offer voice telephony service...to receive federal universal service support.")

In the *CAF Order,* the FCC specifies, in ¶80, that carriers are only required to provide one service to <u>qualify</u> to be designated to receive federal universal service support:

> <u>As a condition of receiving support</u>, we require ETCs to offer voice telephony as a standalone service throughout their designated service area. 117 <u>As indicated above, ETCs may use *any technology* in the provision of voice telephony service.</u> [Note 117 With respect to "standalone service," we mean that consumers must not be required to purchase any other services (*e.g.*, broadband) in order to purchase voice service.]" (emphasis added)[38]

I-VoIP is "any technology."  In our Reply Brief in the appeal of the *CAF Order*, Petitioner noted:

> Petitioners argued that by adding "voice telephony service" to the list of supported services under section 254(c)(1), without limiting the definition of that service to "telecommunications services," the Order violates § 254(c)(1). USF Br. 17-18. Respondents denounce this argument as "wrong," FCC Br. 24, but then concede virtually all its premises. They agree that "only 'eligible telecommunications carriers' are eligible for subsidies under section 254," and that an ETC must be a "common carrier" that offers supported services. FCC Br. 26, citing 47 U.S.C. § 214(e)(1)(A). They also agree that an entity can be designated as an ETC under the statute only if it "complies with appropriate federal and state

---

[38]     There is no requirement in the *CAF Order* to provide broadband as a telecommunications service, <u>i.e.,</u> separate from internet access services (or any other telecommunications service to qualify. Indeed, ¶ 71 of the *CAF Order* concedes that FCC "determinations that broadband services may be offered as information services have had the effect of removing such services from the scope of the explicit reference to "universal service" in § 254(c)."

requirements" applicable to telecommunications carriers under Title II of the Act. Id., quoting IP-Enabled Services, 20 F.C.C.R. 10245, 10268 (2005) (subsequent history omitted). This concession was not apparent on the face of the Order, as the FCC specifically included VoIP in the definition of "voice telephony service" without classifying VoIP as a telecommunications service. Order, ¶63 (JA at 412); FCC Br. 26.[39]

In the resulting decision, the 10th Circuit confirmed that carriers must be designated as an eligible *telecommunications carrier* and have *common carrier* status to access funds. See, *In Re: FCC 11-161*, 753 F.3d 1015, at 1048-1049 (10th Cir. 2014):

> [T]o obtain USF [Universal Service] funds, a provider must be designated by the FCC or a state commission as an "eligible telecommunications carrier" under 47 U.S.C. § 214(e). See 47 U.S.C. § 254(e) ("only an eligible telecommunications carrier designated under section 214(e) . . . shall be eligible to receive specific Federal universal service support."). And, under the existing statutory framework, only "common carriers," defined as "any person engaged as a common carrier for hire . . . in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy," 47 U.S.C. § 153(11), are eligible to be designated as "eligible telecommunications carriers," 47 U.S.C. § 214(e). Thus, under the current statutory regime, only ETCs can receive USF funds that could be used for VoIP support. Consequently, there is *no imminent possibility that broadband-only providers will receive USF support under the FCC's Order, since they cannot be designated*

---

[39]    *Joint Universal Service Fund Reply Brief*, at 11-12, filed July 30, 2013, In Re: FCC11-161, 10th Circuit Case No. 11-9900.

as *"eligible telecommunications carriers.*" (emphasis added).

The 10th Circuit made clear that there is "no imminent possibility that broadband-only providers" (or to the 10th Circuit, ruling in 2014, an entity that only provides an *information service*) will receive USF support. This is true, because, according to the statute (and the 10th Circuit) "they CANNOT be designated as eligible *telecommunications carriers"* if they are only providing an information service. Id. (emphasis added) Therefore, I-VoIP providers must be providing a *telecommunications service*. A number of States have made similar legal determinations by designating eligible *telecommunications carriers* to receive federal universal service funding based solely on the carrier's provision of I-VoIP services.[40]

---

[40]     *In The Matter of Transworld Network, Corp. Petition For Designation as an Eligible Telecommunications Carrier Pursuant to § 214(E)(2) of the Communications Act of 1934, as amended, 47 U.S.C. § 214(E)(2), and 17.11.10.24 NMAC*, Before the New Mexico Public Regulation Commission, Case No. 11-00486-UT, FINAL ORDER (issued 20 February 2013) quote is from Exhibit 1, the ALJ's *Recommended Decision*, at 16. ("Based upon its common carrier regulation as an interconnected-VoIP provider, TransWorld meets the requirement of being a common carrier for purposes of ETC designation."); *In Re: Application of Public Service Wireless, Inc. for Designation as an Eligible Telecommunications Carrier in the State of Georgia, Docket No. 35999, Document #152453 Order on Application for Designation as an ETC (March 20, 2014)*, at 1-3 ("Public Service Wireless's basic service offering is wireless . . . VoIP service."); *In re: Application of Cox California Telcom, LLC (U5684C) for Designation as an ETC, Application 12-09-014*, Decision 12-10-002 (10/3/2013), Decision Approving Settlement (rel. 10/07/2013), at 8-9, 11 ("Cox does not distinguish between circuit-switched and packet-switched telephone services. The customer is merely ordering telephone

Given the record, the 10th Circuit's ruling and the statutory text, there is only one legitimate way for the FCC to reach the result proffered in the ***Order***: by classifying I-VoIP as a telecommunications service and forbearing from all other Title II requirements provided such forbearance meets the pro-consumer and pro-competition standard for forbearance.

### C.    I-VoIP is a Telecommunications Service.

Fee-based VoIP services are identical to archetypical *telecommunications service*. The Act defines a "telecommunications service" as "the offering of telecommunications for a fee directly to the public . . . regardless of the facilities used." 47 U.S.C. § 153(53). "Telecommunications," in turn, is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(50).

When determining whether a service falls within a regulatory classification such as "telecommunications service," the key inquiry is whether end-users perceive the service as offering the functionalities that meet the statutory definition. See, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 986-99 (2005) (affirming FCC's determination that regulatory

---

service." and "Cox asserts by offering a service that utilize[s] VoIP to the public on a nondiscriminatory basis, Cox fulfills the role of common carrier.")

classification of cable modem service turned on nature of functions end-user is offered).

In § 153(52), (53) & (54), Congress made clear that distinctions in technology deployed to transmit voice communication are not relevant in classifying a service as a "telecommunications service." 47 U.S.C. § 153(52-54). Congress' definition of "advanced telecommunications capability" in § 706 likewise makes clear that such capability is "without regard to any transmission media or technology" and "enables users to originate and receive high-quality voice . . . telecommunications using any technology." 47 U.S.C. § 1302.

The fact a service uses IP technology rather than some other technology to deliver its voice service is immaterial to proper classification.  By mandating technology neutral determinations, Congress intended that functionally-similar services, like basic telecommunications services, be classified similarly.  Indeed, the FCC has affirmed elsewhere that telecommunications services are not limited to those employing circuit-switched technology.[41]  Moreover, a focus on the functional nature of particular VoIP services *from the end user's standpoint* is consistent with the *1998 Universal Service Report,* where the FCC correctly

---

[41]    *In re Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 F.C.C. Rcd 24011, 24032, ¶ 41 (1998). ("Nothing in the statutory language or legislative history limits these terms to the provision of voice, or conventional circuit-switched service." "The plain language of the statute thus refutes any attempt to tie these statutory definitions to a particular technology").

observed, that Congress directed "that the classification of a provider should not depend on the type of facilities used … Its classification depends rather on the nature of the service being offered to customers."  They also noted: "[A] telecommunications service is a telecommunications service regardless of whether it is provided using wireline, wireless, cable satellite, or some other infrastructure." *Universal Service Report* at ¶ 59.[42] The nature of the service in turn "depends on the functional nature of the end-user offering." Id. at ¶ 86.

The primary service provided by I-VoIP is real-time two-way voice communications.  It is the functional equivalent of phone service that has been regulated as a *common carrier* service since the Communications Act was adopted in 1934 and as a *telecommunications service* since that term was added in the 1996 Act.  Broadband Internet Access Service, I-VoIP, and Voice Telephony are terms that have been defined by the Commission without reference to the statutory terms/definitions in the Communications Act.[43]

---

[42]    *In the Matter of Federal-State Joint Board on Universal Service*, CC Docket 96-45, Report to Congress, 13 F.C.C.R. 11501 (Released April 10, 1998) (*1998 Universal Service Report*).

[43]    See, 47 C.F.R. § 8.11(a) (definition of broadband Internet access service, which is redesignated as 47 C.F.R. § 8.2 by the *Open Internet Order*) and 47 C.F.R. § 9.3 (definition of interconnected Voice over Internet Protocol).  The 2010 amendments to the Communications Act which added "interconnected VoIP service" and "non-interconnected VoIP service" to the definitions in Section 3 of the Communications Act both refer back to the Commission's regulatory definition at 47 C.F.R. § 9.3.  Unlike the definition of "telecommunications carrier" however,

The Commission has been using these administratively-crafted definitions to avoid applying the statutory definitions, but the courts have long been clear that they are not at liberty to do so. A 1976 D.C. Circuit decision, cited repeatedly by the FCC in the recent *Open Internet Order*, [44] specifies:

> [W]e reject those parts of the Orders which imply an unfettered discretion in the Commission to confer or not confer common carrier status on a given entity, depending on the regulatory goals it seeks to achieve… A particular system is a common carrier by virtue of its functions, rather than because it is declared to be so. Thus we affirm the Commission's classification not because it has any significant discretion in determining who is a common carrier, but because we find nothing in the record or the common carrier definition to cast doubt on its conclusions that SMRS [Specialized Mobile Radio Service] are not common carriers. If practice and experience show the SMRS to be common carriers, then the Commission must determine its responsibilities from the language of the Title II common carrier provisions.[45] (emphasis added).

There is nothing in the statutory definitions of "telecommunications," "telecommunications service" or "telecommunications carrier" in the

---

Congress in 2010 did not include any language excluding "interconnected VoIP service" or "non-interconnected VoIP service" from the other statutory definitions or from being treated as a common carrier. See, 47 U.S.C. §§ 153(25) and (36). Further, § 617(f) of the Communications Act makes clear that "interconnected VoIP service" can be a "telecommunications service" subject to § 255. 47 U.S.C. § 617(f).

[44]    *In the Matter of Protecting and Promoting the Open Internet, 30 F.C.C. Rcd. 5601* (2015) (*Open Internet Order*).

[45]    *National Association of Regulatory Utility Commissioners v. F.C.C.*, 525 F.2d 630, 643-4 (D.C. Circuit 1976) (footnotes omitted).

Communications Act that grants or implies that the Commission has discretion to apply or not apply those definitions.

In fact, the definition of *telecommunications carrier* directly addresses the issue by stating that the term means "any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226)."  The definition continues "[a] telecommunications carrier shall be treated as a common carrier under this Act… except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage."[46]

There are exceptions — and Congress specified what they were.

As the Commission notes repeatedly in the *Open Internet Order,* an offering is a telecommunications service "by virtue of its functions."[47]  The function of VoIP is voice communications in real time — i.e., the transmission of the user's information without change in the form or content — the very definition of "telecommunications."   Anyone offering VoIP to the public is offering telecommunications to the public — the definition of "*telecommunications service*" and is therefore a "*telecommunications carrier*."

---

[46]     47 U.S.C. § 153(51).

[47]     *Open Internet Order* at ¶¶ 363 and 384.

Because VoIP providers are *telecommunications carriers* under the statutory definitions, they are, in theory, already eligible to obtain numbers under § 251. The Commission cannot allocate numbers to I-VoIP providers and at the same time refuse to apply the statutory definitions and allowing I-VoIP to evade other Title II obligations.   If the FCC is going to assert that VoIP providers are not *telecommunications carriers*, then it cannot confer rights Congress reserved for carriers.  Moreover, it must explain how it reaches that conclusion.

> **D.     *The FCC Open Internet Order analysis of Broadband Internet Access Service requires classification of I-VoIP as a telecommunications service.***

In finding Broadband Internet Access Service is a *telecommunications service*, the FCC examined in detail the exact arguments that have heretofore been used to *claim* that I-VoIP is <u>not</u> a *telecommunications service*.  Specifically,   the FCC stated unequivocally "IP conversion functionality is akin to traditional adjunct to basic services, which fall under the telecommunications systems management exception;"[48] examined carefully the use of Domain Names System and caching and determined that both fall within the telecommunications systems management exception and are not inextricably intertwined with

---

[48]     *Open Internet Order* at ¶ 375. The phrase "telecommunications systems management exception" refers to the Congressional exclusion of information processing and storage used for certain purposes from the definition of "information service". *Id.* at n. 974.

telecommunications;[49] specifically found it was not necessary for users to know the geographic location of the end points of the communication and that the addition of packet headers to enable transmission does nothing to alter the form or content of the user's information;[50] and rejected arguments that "Internet-based services" could not be "adjunct-to-basic services" that the Commission had a long history of including under the telecommunications system management exception.[51]

The FCC analysis of Broadband Internet Access Service in the *Open Internet Order* eliminates any argument that I-VoIP is not a *telecommunications service*. There are no factual differences or flexibility in the statutory scheme to allow the FCC to limit its findings to Broadband Internet Access Service.

## II.  *Classification of I-VoIP is a pre-requisite to any reasoned analysis of the extension of Title II rights and obligations to I-VoIP.*

### A.  *If the Court determines the FCC has not classified I-VoIP, it should vacate and remand with instructions to classify I-VoIP as either a telecommunications service or an information service.*

The regulatory scheme imposed by Congress in the 1996 Act to open the market for voice service to competition is determined by one of two categories.

---

[49]     *Id.* at ¶¶ 366 — 371 (DNS) and ¶ 372 (caching).

[50]     *Id.* at ¶¶ 361 — 362. Though the FCC now requires Enhanced 911 to be operational for I-VoIP which means the operator is aware of the location of the calling party. And managed wireline VoIP providers can provide call detail.

[51]     Id. at ¶ 369.

Such services can be classified as either a *telecommunications service*, 47 USC § 153(53), or as an *information service*, 47 USC § 153(24). There is no third category.

The services are mutually exclusive. *Vonage Holdings Corp. v. FCC*, 489 F3d at 1241 ("'[I]nformation service' and 'telecommunications service' are mutually exclusive categories"); *In re Federal-State Joint Board on Universal Service*, Report to Congress, 13 FCC Rec 11501, 11522-23 ¶ 43 (1998) ("The language and legislative history of both the House and Senate bills indicate that the drafters of each bill regarded telecommunications services and information services as mutually exclusive categories.").

There is no question of ripeness.[52]  Classification is purely a legal question. The definitions in the statute are technology neutral and functional.  I-VoIP is a clearly defined and well established service.

This Court can, and should, join the 10th Circuit, and confirm that I-VOIP services are *telecommunications services* based on the record below and the FCC's rules implementing the Order, which necessarily concede that I-VoIP meets the statutory standard for *telecommunications services*.

However, if the Court determines it cannot confirm the FCC's apparent classification, it should remand to preserve judicial efficiency.  The remand should

---

[52]    *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967).

require the FCC to classify the service.  Given the 12-year history of foot-dragging, the well established record, and the clarity of the parameters of the service, the Court should specify a deadline for action on remand.

### B.    Congress specified in the 1996 Act that Classifications have Consequences.

*Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 n.9 (1984) states:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention ... that intention is the law. Respectfully, this Court: "cannot accept . . . argument[s] that the FCC may . . . take action which it thinks will best effectuate a federal policy.

The 1996 Act is clear that Congress intended that classifications have consequences.

The premise for the FCC's actions in this case is that classifications don't matter, i.e., the FCC does not have to follow the statute.

The history of broadband services provided by incumbent local exchange carriers provides a useful example.

36

Changing classifications dramatically altered the Title II treatment of carriers' broadband services in 2005[53] and again last year when the FCC reclassified Broadband Internet Access Service. See, *Open Internet Order,* ¶ 5 ("[W]e concurrently exercise the Commission's forbearance authority to forbear from application of 27 provisions of Title II of the Communications Act, and over 700 Commission rules.").

As that April 2015 FCC *Open Internet Order* indicates, *telecommunications services*, which are necessarily provided by *telecommunications carriers*,[54] are subject to Congressionally-specified Title II mandates *ab initio*.[55] 47 U.S.C. § 160 allows the FCC to forbear from applying any of the Congressionally-imposed Title II duties under specific conditions.

This is a purposeful dichotomy, driven by underlying policy concerns.

---

[53]     *In the Matters of Appropriate Framework for Broadband Access to the Internet over Wireline Facilities Universal Serv. Obligations of Broadband Providers Computer III Further Remand Proceedings: Bell Operating Co. Provision of Enhanced Services; 1998 Biennial Regulatory Review -- Review of Computer III & ONA Safeguards & Requirements Conditional Petition of the Verizon Tel. Companies for Forbearance Under 47 U.S.C. 160(c),* 20 F.C.C.Rcd. 14853 (2005)

[54]     See, 47 U.S.C. § 153(24), defining a telecommunications carrier as "any provider of telecommunication services.")

[55]     See, e.g., 47 U.S.C. §§ 201-276.

Logically, to conduct any legal analysis of the application of the FCC's Title II authority to any service, the agency must first categorize any service as one or the other. The classification drives the analysis.

### C. The FCC refusal to classify I-VoIP in these circumstances is arbitrary and demonstrates a lack of reasoned decision-making.

The FCC's refusal to classify I-VoIP is on its face, arbitrary[56] and capricious, has, as discussed, *supra*, demonstrably perverse impacts, and exhibits a decided lack of reasoned decision-making.

In spite of the recent 10th Circuit ruling, and the FCC's own rules implementing this ***Order***, the FCC continues to <u>claim</u> it has not classified the underlying service in any way.

If true, to uphold the agency unquestionably <u>requires</u> this Court to speculate on outcomes.

In this ***Order***, the FCC fails to present any arguments why I-VoIP is neither a telecommunications service nor an information service.

It offers no reason for this deficit.

---

56    *Am. Trucking Associations, Inc. v. I.C.C.*, 697 F.2d 1146, 1150 (D.C. Cir. 1983) ("The arbitrariness which the APA proscribes is the failure to draw reasoned distinctions where reasoned distinctions are required.")

Short of "we disagree", there is no explanation in the ***Order*** of why I-VoIP should not be considered either an *information service* or a *telecommunications service.* Id. at ¶ 57.

This permits the FCC to suggest, *by simply ignoring NARUC's argument below,* that the classification of the underlying services — the very foundation of the Act's entire oversight scheme to develop competitive markets in telecommunications services — is irrelevant and not at issue. Id. at ¶ 89.

It is not just at issue — it is the issue.

If the FCC had classified — or this Court classifies - I-VoIP as a *telecommunications service*, there is no question that the agency can both grant direct access to numbers and create a federal licensing procedure. The pre-existing rules *already* allow for both. I-VoIP providers, including the largest *incumbent local exchange carriers* (who are all converting their systems to provide I-VoIP), would be subject to § 252-sanctioned State arbitrations, § 252(i) opt-in obligations, State service quality and universal service oversight, and all other Title II rules with which *carriers* must comply absent forbearance.

At the same time, there would be no reason for this Court to *speculate* on the possible expanded scope of the FCC's authority under § 251(e).      And yet, the FCC refuses to rule out classification as a *telecommunication service* as a possible outcome.

39

It is difficult to oppose, or support, the FCC's rationale for inaction as no rationale for inaction is provided.

The fact is, for purposes of the analysis presented, the FCC <u>must</u> be asking the Court to <u>assume</u> that I-VoIP is an *information service* - a stretch given, ironically, that the FCC treats the service explicitly "for numbering purposes" — and just about every other way - as a *telecommunications carrier.*        Otherwise the inquiry into the scope of authority granted the FCC under § 251(e) would be unnecessary because, as *telecommunications carriers,* I-VoIP providers would already have direct access to numbers.

The ***Order*** does not attempt to provide any evidence or rationale for why that assumption is reasonable.  Indeed, all the information presented in the ***Order*** suggests an assumption that I-VoIP is anything other than a *telecommunication service* is patently unreasonable.

But even if this Court is willing to assume I-VoIP is an *information service*, when the FCC explicitly declines to say what it is, that assumption poses additional analytical problems.  To assume I-VoIP is an *information service*, (or to discuss the recently discovered expanded scope § 251(e)), the Court must also consider the scope of the FCC's ancillary jurisdiction — which the ***Order*** did not.  There is not even a minimal discussion of the concept in the ***Order***.  It is referenced once — in

a one sentence footnote referencing a prior order never subjected to judicial review. ***Order*** at ¶ 54 n. 185 (JA __).[57]

But the biggest problem with proceeding down this analytical path, is that if the Court rules *as if* the FCC had actually classified I-VoIP as an *information service*, it will address a hypothetical legal question. By definition, no concrete issue has been presented for the Court's review. The FCC will not confirm that I-VoIP is not a *telecommunications service*. If at some point, as seems likely, another Court joins the 10th Circuit in forcing the FCC to concede the obvious, that I-VoIP is a *telecommunications service*, any ruling on the applicability of § 251(e) to "non-telecommunications providers" covers a purely hypothetical question that, by definition, cannot apply in any circumstance.

---

[57]    In the rulemaking that led to the ***Order***, the FCC also sought comment on the agency's ability to rely on the FCC's ancillary authority under Title I to give I-VoIP providers direct access to numbers. *In the Matter of Numbering Policies for Modern Communications*, 28 F.C.C.Rcd. 5842, 5876 at ¶ 85 (2013). 47 U.S.C. § 154(i) says the FCC may "perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." As noted, the requirements imposed are in fact "inconsistent with this chapter" and are therefore not within the FCC's ancillary authority. To argue, as the FCC did in the proposed rulemaking, that its new numbering scheme is "reasonably ancillary to the Commission's performance of . . . statutory duties . . . under sections 251," is a *non sequitur*. Id. That proposed new scheme is flatly inconsistent with § 251 which only applies obligations on and confers rights to *telecommunications carriers*. Section 201 provides no comfort for the FCC either as it requires the FCC to "carry out the provisions of this chapter," which it should be clear from the discussion, *infra*, is exactly what the FCC has chosen *not* to do.

Jurisprudence on ancillary jurisdiction does not suggest otherwise. With two exceptions, Petitioner could not locate any case dealing with FCC ancillary jurisdiction *where the agency actually specifies it has not decided a fundamental issue that is potentially dispositive of the case*.[58]

In both exceptions, involving I-VoIP, no petitioner challenged the FCC's decision to defer classification of I-VoIP. *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232 (D.C. Cir. 2007). Indeed in one of the two, no one challenged the

---

[58]    See, e.g., *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989 and 996 (2005) (noting in dicta, the FCC found cable companies in the broadband internet business offer an "information service"); *United States v. Southwestern Cable Co.,* 392 U.S. 157, 164 (1968) ("[T]he Commission reasoned that CATV systems are neither common carriers nor broadcasters, and therefore are within neither of the principal regulatory categories created by the Communications Act."), *United States v. Midwest Video Corp.,* 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972), and *FCC v. Midwest Video Corp.,* 440 U.S. 689, 696 (1979)(Act preceded the advent of cable television and understandably did not expressly provide for the regulation of that medium.") Cf. *Illinois Bell Tel. Co. v. F.C.C.,* 883 F.2d 104, 105-06 (D.C. Cir. 1989) (FCC removed from Title II coverage the provision of Customer Premises Equipment (CPE) and so-called "enhanced services" and reserved Title II regulation solely for the offering of "basic" transmission service. Subsequently exercised ancillary jurisdiction over the CPE and enhanced services.) *Capital Network Sys., Inc. v. F.C.C.,* 3 F.3d 1526, 1528 (D.C. Cir. 1993) (Order held that billing and collection was not a "communication service," and that even if it were deemed a communication service, it was "doubtful" that it could qualify as a "common carrier service," Id. at 1168—69; hence, such services were not, as the Commission had previously thought, subject to regulation under Title II of the Act. Although the Commission found that it could perpetuate its regulatory regime on the authority of its "ancillary jurisdiction" under Title I.)

FCC's authority at all — just the arbitrary way they wielded it. *Nuvio Corp. v. F.C.C.*, 473 F.3d 302 (D.C. Cir. 2006).

In the proposed rulemaking that led to the Order, the FCC was quite candid in conceding the real impact of its refusal to classify I-VoIP:

> [T]he Commission has not addressed the classification of interconnected VoIP services, and thus <u>retail interconnected VoIP providers in many, but not all, instances take the position that they are not subject to regulation as telecommunications carriers, nor can they directly avail themselves of various rights under sections 251 and 252 of the Act</u>.

In other words, the tools Congress provided the States to protect competitive entry, service quality and safety for consumers if I-VoIP services, and universal service currently do not apply. Other Title II mandates are being applied in a patchwork piecemeal fashion by the FCC.

Classification by this Court, or the FCC on remand, as a *telecommunications service* will bring the FCC's oversight of I-VoIP back squarely within the 1996 Act's structure. Alternatively, classification by the FCC of the services on remand as an *information service* would allow stakeholders an opportunity to <u>finally</u>, through an appeal, demonstrate the inevitable illogic and illegality of such a classification.

**III.    *The FCC lacks authority to impart number portability rights and obligations on entities that do not provide telecommunications services.***

I-VoIP is a "*telecommunications service*".  As discussed *infra*, the FCC's rules implementing the order foreclose any other outcome.  However, to respond to the arguments presented in the ***Order***, requires the Court to adopt the agency's skewed frame of reference.

The ***Order***, at ¶ 56, presents arguments *as if* the agency has actually classified I-VOIP services as "something" other than a *telecommunications service, while simultaneously (and illogically) insisting* it has not — stating specifically it has not "classified interconnected VoIP services as telecommunications services OR information services." (*Emphasis added*)

The ***Order*** argues the FCC has authority to expand obligations imposed by Congress on *telecommunications carriers* to port numbers to what the FCC claims *may* be non-carriers, i.e., the putatively "unclassified" VoIP services.

One thing is clear — if one can legitimately consider that I-VOIP is not a *telecommunications service*, then the FCC lacks authority to: (i) impose Title II porting obligations upon them or (ii) require existing carriers to "port" numbers to them.

It is axiomatic that an agency may not confer power upon itself. *Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355, 374 (1986). The issue is always "whether the statutory text forecloses the agency's assertion of authority, or not." *City of Arlington v. F.C.C.*, 133 S.Ct. 1863, 1871 (2013).

In this case, it does.

The plain text of the Statute indicates that the FCC lacks authority to extend the rights and obligations of number portability to providers that are not *telecommunications carriers*.

**A.** **Congress specifies that only telecommunications service carriers have the right to receive number ports and the obligation to port numbers.**

In 47 U.S.C § 153(37), Congress made clear only "users of *telecommunications services*" are given the option to port numbers:

> "number portability" means the ability of *users of telecommunications services* to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience *when switching from one telecommunications carrier to another.* (emphasis added).

Only *telecommunications carriers* - providers of *telecommunication services* - are required to port numbers — and then - only to other *telecommunications carriers*.

45

In 47 U.S.C. § 251(b) (2), Congress explicitly imposed on all local exchange carriers[59] the "duty to provide, to the extent technically feasible, number portability."  Moreover, as the FCC pointed out in 1996:

> [i]n addition to the duties imposed by section 251(b) on all LECs, section 251(c)(1) imposes upon incumbent LECs, inter alia, the "duty to negotiate in good faith ... the terms and conditions of agreements to fulfill" the section 251(b) obligations, including the duty to provide number portability.

*In the Matter of Tel. No. Portability*, 11 F.C.C. Rcd. 8352 (1996).

This duty is reinforced by 47 U.S.C. § 251(b)(3)'s requirement for all *local exchange carriers* to assure that "competing providers of telephone exchange service and telephone toll service…have nondiscriminatory access to telephone numbers."

The only other available classification option, *information services,* were assigned no such obligations.

47 U.S.C § 153(51) reinforces the paradigm, clarifying that those portability duties *cannot* be imposed on entities that are not providing *telecommunications services.* Specifically, § 153(51) defines *telecommunications carrier* as any provider of *telecommunications services* before specifying that:

---

[59]     47 U.S.C § 153(32) local exchange carriers are telecommunications service providers. See, 47 U.S.C. § 153(32).

> A *telecommunications carrier* shall be treated as a common carrier under this chapter <u>only to the extent that it is engaged in providing *telecommunications services.*</u>"

Id. (emphasis added).

Consistent with this statutory framework, the obligation to pay for the cost of number portability is also assigned only to *telecommunications carriers* pursuant to § 251(e)(2).[60]

Because the Commission has so far refused to apply the statutory requirements applicable to "telecommunications service" and "telecommunications carriers" to I-VoIP providers, the Commission cannot grant the rights Congress provided to telecommunications service <u>users</u> and *telecommunications carriers* to I-VoIP providers.

---

[60]     47 U.S.C. § 251(e)(2).

47

### B.    FCC justifications for giving non-carriers the rights and obligations of a Title II common carrier lack merit.[61]

The *Order*, ¶¶ 78-82, explains the FCC's legal theory.  There are nuances, but basically the *Order* finds it "unnecessary to first determine the classification of interconnected VoIP" because Section 251(e)'s grant of "exclusive jurisdiction" over the portions of the "North American Numbering Plan" and the requirement to make numbers "available on an equitable basis" allows the agency to ignore more specific provisions of the Act limiting portability to *telecommunications carriers*.

But the FCC's argument is flawed.

### [1]    Statutes are "*to be read as a whole since context matters*."[62]

Context matters.

---

[61]    The *Order* also cites to cases that are not relevant to the issues before this Court, e.g., *Order* at ¶ 81, in note 288 (J.A.__) cites to two cases where the FCC's statutory authority was clear and the carriers involved were in fact *telecommunication carriers* - to support an "argument" that giving direct access to I-VoIP providers is justified because carriers and customers might benefit. *Texas Office of Pub. Util. Counsel v. F.C.C.,* 183 F.3d 393, 433 (5th Cir. 1999). ("We agree with the FCC that the plain language of § 254(f) simply requires that "[e]very telecommunications carrier that provides intrastate telecommunications services" contribute to state mechanisms.") In both cases, there was no question that the statute required the carriers to pay the fees. The questions were how much and were States barred from making assessments.

[62]    *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221 (1991).

The FCC is not free to rely upon more general authority granted elsewhere to impose obligations flatly inconsistent with very specific statutory provisions on numbering obligations.  "A 'statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'"[63]  Moreover, an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning the statute can bear.[64]

The Commission is limited to implementing the statutory regime clearly dictated and delineated by Congress.[65]

The D.C. Circuit recently rejected the FCC's reliance on general § 1302 authority to impose common carrier regulation specifically precluded by § 153(51), finding the FCC cannot utilize its § 1302 authority:

> in a manner that contravenes any specific prohibition contained in the Communications Act. <u>See</u> Open Internet Order, 25 F.C.C.R. at 17969 ¶119 (reiterating the Commission's disavowal of 'a reading of Section 706(a)

---

[63]  *In re Dawes*, 652 F.3d 1236, 1242 (10th Cir. 2011) *cert.denied*, 132 S. Ct. 2429 (U.S. 2012) *quoting Corley v. United States,* 556 U.S. 303, 314 (2009)'")

[64]  *MCI Telecomm'ns Corp. v. AT&T*, 512 U.S. 218, 229 (1994) (citing *Pittston Coal Group v. Sebben,* 488 U.S. 105, 113, 102 L. Ed. 2d 408, 109 S. Ct. 414 (1988); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-843 (1984)).

[65]  <u>Id</u>. 512 U.S. 234 (rejecting "the introduction of a whole new regime of regulation (or of free-market competition), which may well be a better regim but is not the one that Congress established.")

that would allow the agency to trump specific mandates of the Communications Act.'); <u>see</u> <u>also</u> *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment.") . . . the Commission would violate the Communications Act were it to regulate broadband providers as common carriers.[66]

Similarly, the FCC is precluded from relying on broader sources of authority to ignore or override the definition of *number portability* in Section 153(37). Requiring the porting of numbers to and from providers the FCC has not classified as *telecommunications carriers* (and that provide services that the Commission has not classified as *telecommunications services*), "would run afoul of Section 153(51),"[67] which bars treating those that do not provide *telecommunications services* as common carriers "under this chapter,"[68] and also of Section 153(37), which limits number portability to transfers from one carrier to another.

### [2] *The obligations of § 251(b)(2) conflicts with granting direct access to numbers.*

In paragraph 82, the FCC contends:

> [A]uthorizing direct access to numbers for interconnected VoIP providers under section 251(e) [does not] conflict with the fact that section 251(b)(2) addresses LECs'

---

[66]    *Verizon v. FCC*, 740 F.3d 623, 650 (D.C. Cir. 2014).

[67]    <u>Id.</u>

[68]    <u>Id.</u>

> obligation to allow customers to port numbers when switching from one *telecommunications carrier* to *another.* We believe that section 251(b)(2) is reasonably understood simply as reflecting a requirement that Congress anticipated as necessary to promote competition in local markets, rather than reflecting any inherent Congressional judgment regarding the universe of entities that might have direct access to telephone numbers.

This is not the position the agency espoused just after passage of the 1996 Act. Then, the FCC specified that number portability runs only to *telecommunications carriers*:

> Because the 1996 Act's definition of number portability requires *LECs* to provide number portability when customers switch from any *telecommunications carrier to any other*, the statutory obligation of LECs to provide number portability runs to other *telecommunications carriers*. Because CMRS falls within the statutory definition of *telecommunications service*, CMRS carriers are telecommunications carriers under the 1996 Act. As a result, LECs are obligated under the statute to provide number portability to customers seeking to switch to CMRS carriers. (emphasis added)

*In the Matter of Tel. No. Portability*, 11 F.C.C. Rcd. 8352 (1996).

Nor does it square with the FCC's positions in the cited *VoIP LNP Order,* which provided access to numbers to partners of I-VoIP providers, but made absolutely certain the actual porting obligation fell on the I-VoIP provider's *telecommunications carrier* partner:

> In this Order, we prescribe requirements that expand number portability to include ports to and from interconnected VoIP providers, and therefore find that section 251(b)(2) grants us authority to impose obligations on the interconnected VoIP providers' LEC *numbering partners* to effectuate those requirements. By holding the LEC *numbering partner* responsible for ensuring a porting request is honored . . . ***we thus abide by this statutory mandate***.[69] (emphasis added).

The ***Order***, at ¶ 54, cites to the *VoIP LNP Order* several times for the very precisely and somewhat disingenuously worded proposition that:

> The Commission concluded at the time that it had "ample authority" to impose porting requirements on local exchange carriers and interconnected VoIP providers.[70] (emphasis added).

The fact is, as the ***Order*** acknowledges, except for the two limited waivers, which were unappealable on ripeness grounds, this ***Order*** is the first to provide I-VoIP providers number portability without a telecommunications carrier Partner to comply with the 251(b)(2) "statutory mandate." ***Order*** at ¶ 4 (J.A. ___)

In the *VoIP LNP Order*, when extending number portability to I-VoIP providers' *carrier partners*, the FCC found:

> It is well established that our rules allow *only* carriers direct access to NANP numbering resources to ensure that the numbers are used efficiently and to avoid number

---

[69]     *VoIP LNP Order,* 22 F.C.C. Rcd. 19544.

[70]     Compare citations to the same order. Order at ¶ 46 and ¶ 58. (JA ___, ___)

exhaust. Thus, many interconnected VoIP providers may not obtain numbering resources directly from the NANPA because they will not have obtained a license or a certificate of public convenience and necessity from the relevant states. <u>Interconnected VoIP providers that</u> have not obtained a license or certificate of public convenience and necessity from the relevant states or otherwise <u>are not eligible to receive numbers directly from the administrators may make numbers available to their customers through commercial arrangements with carriers</u> (*i.e.*, numbering partners).[71]

Unlike the ***Order*** on review, the Commission's focus on *carrier* obligations in the *VoIP LNP Order* is consistent with the statutory definition of *number portability*, which is limited to the porting of numbers used by *carriers* for *telecommunications services*. 47 U.S.C. § 153(37).

The *VoIP LNP Order* never considered the scope of the number portability obligation where no carrier partner is involved. It never explained how *number portability* as defined in the statute can apply to a provider such as Vonage that considers itself neither a *carrier* nor a provider of *telecommunications services*, <u>particularly if it were interacting with another non-carrier provider of non-telecommunications-services</u>.[72]

---

[71]    *VoIP LNP Order*, ¶ 20 (citations omitted). Although the same order states that it is not intended to prejudge the pending waiver petitions (<u>id.</u>, ¶ 20 & n.59), it also fails to provide any guidance as to number portability obligations under any circumstances other than where a VoIP provider partners with a wholesale carrier.

[72]    The Commission makes some effort to provide a legal rationale for the imposition of the "number portability" obligation to VoIP providers and their

The *Order* is a considerable departure from the rationale provided in the prior *VoIP LNP Order*.  Agencies must "ordinarily display awareness that it is changing position," apply their own precedents consistently or reasonably explain any departures from those precedents. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (*Fox*).  The ***Order***, at ¶¶ 54 & 81, characterizes this new policy as consistent with the *VoIP LNP Order*.  Given the ***Order*** relies on the same basic § 251(e)(1) arguments as in the *VoIP LNP Order*, but never references the considerable and significant differences from the current jurisdictional theory posed by the cited references, *supra*, the decision necessarily fails to meet the standard articulated in *Fox* and is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

**[3]    *The FCC's construction of § 251(e)(1) cannot be squared with the text of that subsection or the remainder of § 251 and the 1996 Act*.**

The FCC's construction of § 251(e)(1) makes no sense.

In the ***Order***, at ¶¶ 80–83 (J.A. __), the FCC critiques directly the Supreme Court teachings that context matters.  Specifically, they disagree that authority granted in § 251(e)(1) must be read in conjunction with § 251(e)(2), which requires

---

carrier partners in the *VoIP Number Portability Order*. <u>Id</u>., at ¶¶ 21-29. But the rationale provided is part of an Order that sets as its starting point that *only carriers can obtain direct access to phone numbers*, and does not begin to address, for example, the port from one non-carrier to another non-carrier of a non-telecommunications service, which could not, and cannot, be shoe-horned into the statutory definition of *number portability*.

that the costs of number administration and portability be borne by "all telecommunications carriers."

And they disagree that the broader power to administer numbers cannot be applied in a way that conflicts directly with the more specific requirements and duties specified in §§ 251(b), 251(e), 153(37), and 153(51).

The basic response hidden amongst the verbiage is that — to the FCC - context does not matter:

> Nothing in section 251(e) restricts the Commission's jurisdiction to telecommunications carriers. In contrast, sections 251(a)-(c) pertain expressly to telecommunications carriers, local exchange carriers, and incumbent local exchange carriers, respectively. It is a well-understood rule of statutory construction that, when Congress includes a term in one portion of the statute but not another, it did so intentionally.

However, not only is this a disingenuous approach to statutory construction, but the premise of the argument is flawed: Section 251(e)(1) indicates internally its application to *telecommunication service* providers.

Section 251(e)(1) specifies creation of entities to "administer *telecommunications* numbering."  Congress defined *telecommunications* in 47 U.S.C. § 153(50) as "transmission. . .of information of the user's choosing without change. . .of the information as sent and received."  If an entity offers such service to the public for a fee — that entity is necessarily providing a *telecommunications service*. 47 U.S.C. § 153(50).

55

Section 251(e)(1) also discusses administration of the North American Numbering Plan — which was created by the archetype *telecommunications service* provider — AT&T in the 1940s to facilitate routing long distance calls from *telecommunications carrier* to *telecommunications carrier*. See, note 78, *infra*.

The next subpart of the same Section - § 251(e) (2) — confirms the focus by specifying that costs for both number administration and number portability "shall be borne" by *telecommunications service* providers — "on a competitively neutral basis."[73]

It is not clear how it would be "competitively neutral" to allow these "unclassified" VoIP providers, which the FCC points out are providing over one-third of retail phone services in direct competition with existing

---

[73]     Even § 251(e)(3) specifically references "telephone service." Compare 47 U.S.C. § 153(54) defining *telephone exchange service* as "service provided through a system of . . . facilities . . . by which a subscriber can originate and terminate a *telecommunications service*." (emphasis added). The 1996 Act clearly indicates the obvious focus of § 251 on *telecommunications services*. Even the conferenced bill captioned the § 251 et. seq. amendments: "TITLE I— *TELECOMMUNICATION SERVICES* Subtitle A—*Telecommunications Services"* H.Rept. 104-458 — 104th Congress (1995-1996) (December 31, 1995). Part (e) is in § 251, which, as those captions suggest, was the centerpiece of Congress' plan to open up local *telecommunications service* markets to competition. Section 251 mentions *telecommunications service* and terms that reference specific kinds of *telecommunications services* or specific kinds of *telecommunications service providers* 49 times. There is no mention of *information services*.

56

telecommunications carriers — to avoid funding both *number administration* and *portability costs*.

The FCC cites *Brown v. Gardner*, 513 U.S. 115, 120 (1994) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1993)), as the basis for its flawed argument that § 251(e) isn't limited to telecommunications services.

But the principle is more logically applied to demonstrate the flaws in the FCC's approach.

For example, even though Congress said only *telecommunications carriers* "shall" bear the costs of administration and portability, the FCC believes it can ignore that proscription.[74]

But it is clear that if Congress wanted to provide an option for the FCC to charge entities that are not *telecommunications providers* (or more accurately whose status the FCC claims it has not yet classified), it could have done so.  It certainly did just that in the context of contributions to the federal universal service fund - specifying in 47 U.S.C. § 254(d) that every *telecommunications carrier*

---

[74]     "[S]ection 251(e)(2) . . . does not preclude the Commission from exercising its authority to require other providers of comparable services to make such contributions." ***Order*** at ¶ 81 (J.A. ___)

57

"that provides interstate telecommunications services" shall contribute, but allowing the FCC to access "any other provider of interstate telecommunications."

The FCC also argues it can effectively impose the § 251(b)(2) obligation on entities of indeterminate status when historical practice, and the FCC position heretofore, has been that simply wasn't permissible. Again, if Congress wanted to provide such an option, it certainly knows how to do so.

For example, 47 U.S.C. § 251(c) places a duty on *incumbent local exchange carriers* "to negotiate in good faith to fulfill the duties described in" § 251(b), which includes number portability. The negotiations are subject to a State arbitration procedure if an agreement is not reached in a specific time frame. Section 251(h)(2) gives the FCC authority to impose this much more onerous obligation on local exchange companies that were not defined as *incumbents* under § 251(h)(1).

Unlike these two examples, there is no analogous provision allowing the FCC to impose number portability obligations on unclassified carriers.

### [4]    *Section 251(e) gives the FCC exclusive jurisdiction over telecommunications numbering administration arrangements but not local number portability.*

Assuming *arguendo*, the FCC's "exclusive" authority over numbering administration does allow it to ignore the rest of the statute and give direct access

58

to numbers to absolutely anyone, § 251(e) authority over numbering administration, at least to Congress, does not include *number portability*.

In § 251(e)(1), which grants the FCC "exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States," does not mention *number portability*.

However, the next subsection, § 251(e)(2), states:

> The cost of establishing <u>telecommunications numbering administration arrangements</u> and <u>number portability</u> shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission. (emphasis added).

If "telecommunications numbering administration arrangements" includes "number portability," there would be no reason for Congress to specify both. If that was what Congress meant, this section would instead read "administration arrangements <u>including</u> number portability" or more likely just "telecommunications numbering administration arrangements."

That they are - and were meant by Congress to be - separate concepts, is supported by history, current administration, and the fact that portability is separately defined elsewhere in the Act.

The North American Numbering Plan (numbering administration arrangements) predated the 1996 Act by 49 years. It has a separate administrator

and has its own website.[75]    It was created by AT&T in 1947 <u>to</u> <u>facilitate</u> <u>long</u> <u>distance</u> <u>calling</u> and it includes 19 other countries.

On the other hand, Local Number Portability was mandated by the 1996 Act that provided the controlling statutory definition.    It too has a separate administrator and its own website.  It was created to let customers keep their phone number when switching carriers.[76]

Logically, whatever authority the FCC has to make rules for *number portability* is not § 251(e), but more likely lodges under § 251(d)(1) "to establish regulations to implement the requirements of this section."

### [5]    *The FCC's prior expansions of number portability all involved entities already classified as telecommunications service carriers.*

The ***Order*** at ¶ 82 (J.A. __), states the FCC has required service providers "that have not been found to be LECs, but that are expected to compete against LECs, to comply with the LNP obligations set forth in Section 251(b)(2)."

---

[75]    "The North American Numbering Plan (NANP) is an integrated telephone numbering plan serving 20 North American countries that share its resources. . . AT&T developed the [NANP] in 1947 to simplify and facilitate direct dialing of long distance calls." *About the North American Numbering Plan* at https://www.nationalnanpa.com/about_us/abt_nanp.html (last accessed March 29, 2016).

[76]    Number Portability Administration Center — Number Portability at https://www.npac.com/number-portability/what-is-lnp (last accessed March 29, 2016).

But the cases cited, unlike in the *Order*, all involved entities that were classified as *telecommunications carriers*. In footnote 292 to that statement, the *Order* provides two examples. First, the *Order*, cites the *VoIP LNP Order*, which was never appealed. As discussed earlier, there the FCC made absolutely certain to comply with the § 251(b)(2) "mandate" by putting the porting obligations on a *telecommunications carrier*. It does not provide support for the FCC's current determinations. Second, the *Order* cites to the *Telephone Number Portability*, CC Docket No. 95-116, RM 8535, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 8352, 8431-32, ¶ 153 (1996), an order which specifically pointed out, at ¶ 8, what no one can dispute, that CMRS providers are also *telecommunications carriers*. ("Number portability must be provided in these areas by all LECs to all telecommunications carriers, including [CMRS] providers.") Id. But there were also other factors distinguishing this application. At ¶ 153 of that order, the agency pointed out that, unlike the current circumstances, the Act gives the FCC flexibility in two places to apply § 251(b) requirements to CMRS providers, the definition of local exchange carrier in § 153(32) and in § 332(c)(1)(A).

## CONCLUSION

The FCC should not be allowed to continue refuse to enforce the Act. As the 10th Circuit, numerous States, and the FCC's new numbering rules make clear, I-VoIP is, in fact, a *telecommunications service*. Petitioner requests this tribunal (i) confirm that classification and (ii) remand for proceedings consistent with that classification. Alternatively, Petitioner requests this Court vacate the ***Order*** and remand requiring the FCC to classify I-VoIP by a date certain.

Respectfully submitted,

/s/ *James Bradford Ramsay*
_____
**James Bradford Ramsay**
**GENERAL COUNSEL**
**NATIONAL ASSOCIATION OF REGULATORY**
    **UTILITY COMMISSIONERS**
**1101 VERMONT AVE., N.W., SUITE 200**
**WASHINGTON, D.C. 20005**
**TEL: (202) 898-2207**
**FAX: (202) 384-1554**
**E-MAIL: JRAMSAY@NARUC.ORG**

**Dated: April 7, 2016**

62

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) in that this brief contains 13690 words. In making this certification, Joint Petitioners' counsel has relied on the word count function of Microsoft Word, the word processing system used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14 pt. font Times New Roman type style.

/s/ *James Bradford Ramsay*

_____

**James Bradford Ramsay**
GENERAL COUNSEL
NATIONAL ASSOCIATION OF REGULATORY
     UTILITY COMMISSIONERS
1101 VERMONT AVE., N.W., SUITE 200
WASHINGTON, D.C. 20005
TEL: (202) 898-2207
FAX:  (202) 384-1554
E-MAIL: JRAMSAY@NARUC.ORG

**Dated: April 7, 2016**

## CERTIFICATE OF SERVICE

I hereby certify that the electronic original of the foregoing "Brief of Petitioner" was filed with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit on this 7th day of April, 2016 through the CM/ECF electronic filing system, and thus also served on counsel of record.

/s/ James Bradford Ramsay

_____

**James Bradford Ramsay**
**GENERAL COUNSEL**
**NATIONAL ASSOCIATION OF REGULATORY**
       **UTILITY COMMISSIONERS**
**1101 VERMONT AVE., N.W., SUITE 200**
**WASHINGTON, D.C. 20005**
**TEL: (202) 898-2207**
**FAX: (202) 384-1554**
**E-MAIL: JRAMSAY@NARUC.ORG**

**Dated: April 7, 2016**

64

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

No. 15-1497

_____

NATIONAL ASSOCIATION OF REGULATORY UTILITY
COMMISSIONERS,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and THE UNITED STATES OF AMERICA,

*Respondents*.

_____

On Petitions for Review of an Order
of the Federal Communications Commission

_____

# PETITIONER STATUTORY
# ADDENDUM

# **Contents**

5 U.S.C. §706. Scope of review ................................................... SA-1

28 U.S.C. §2343. Venue .............................................................. SA-1

U.S.C. §2344. Review of orders .................................................. SA-1

47 U.S.C. §151. Purposes of chapter .......................................... SA-2

47 U.S.C. §152. Application of chapter ....................................... SA-2

NOTES 47 U.S.C. §152. §601 ..................................................... SA-3

47 U.S.C. §153. Definitions ....................................................... SA-3

    (1) Advanced communications services ................................ SA-3

    (11) Common carrier .......................................................... SA-3

    (16) Customer premises equipment ...................................... SA-4

    (20) Exchange access ......................................................... SA-4

    (24) Information service ...................................................... SA-4

    (25) Interconnected VoIP service ........................................ SA-4

    (28) Interstate communication ............................................ SA-4

    (32) Local exchange carrier ............................................... SA-4

    (33) Mobile service ............................................................ SA-5

    (36) Non-interconnected VoIP service ................................. SA-5

    (37) Number portability ..................................................... SA-5

    (50) Telecommunications .................................................... SA-6

    (51) Telecommunications carrier ......................................... SA-6

    (52) Telecommunications equipment .................................... SA-6

    (53) Telecommunications service ......................................... SA-6

    (54) Telephone exchange service ......................................... SA-6

    (55) Telephone toll service ................................................. SA-6

    (59) Wire communication ................................................... SA-6

47 U.S.C. §154 Federal Communications Commission ................... SA-7

47 U.S.C. §160 Competition ....................................................... SA-7

47 U.S.C. §201 Service and charges ........................................... SA-8

47 U.S.C. §214 Provision of universal service ............................. SA-9

47 U.S.C. §226 Telephone operator services ............................... SA-11

47 U.S.C. §251 Interconnection ................................................. SA-11

47 U.S.C. §252 Negotiation, arbitration, and approval of agreements ............ SA-16

47 U.S.C. §253 Removal of barriers to entry .............................. SA-21

47 U.S.C. §254 Universal service ............................................... SA-22

47 U.S.C. §261 Effect on other requirements .............................. SA-25

47 U.S.C. §332 Regulatory treatment of mobile services .............. SA-25

47 U.S.C. §617(f) Access to advanced services ........................... SA-29

47 U.S.C. §1302 Advanced telecommunications .......................... SA-29

## TITLE 5   SUBCHAPTER I—THE AGENCIES GENERALLY

**§706. Scope of review -** To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## Title 28     SUBCHAPTER VI-PARTICULAR PROCEEDINGS

***28 U.S.C. §2343. Venue*** - The venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit.

***28 U.S.C. §2344. Review of orders;*** time; notice; contents of petition; service - On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of— (1) the nature of the proceedings as to which review is sought; (2) the facts on which venue is based; (3) the grounds on which relief is sought; and (4) the relief prayed. The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the

agency and on the Attorney General by registered mail, with request for a return receipt.

## TITLE 47 SUBCHAPTER I—GENERAL PROVISIONS

***47 U.S.C. §151. Purposes of chapter; Federal Communications Commission created -*** For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

***47 U.S.C. §152. Application of chapter*** –

(a) The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in the Canal Zone, or to wire or radio communication or transmission wholly within the Canal Zone. The provisions of this chapter shall apply with respect to cable service, to all persons engaged within the United States in providing such service, and to the facilities of cable operators which relate to such service, as provided in subchapter V–A.

(b) Except as provided in sections 223 through 227 of this title, inclusive, and section 332 of this title, and subject to the provisions of section 301 of this title and subchapter V–A of this chapter, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any

carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (3) any carrier engaged in interstate or foreign communication solely through connection by radio, or by wire and radio, with facilities, located in an adjoining State or in Canada or Mexico (where they adjoin the State in which the carrier is doing business), of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (4) any carrier to which clause (2) or clause (3) of this subsection would be applicable except for furnishing interstate mobile radio communication service or radio communication service to mobile stations on land vehicles in Canada or Mexico; except that sections 201 to 205 of this title shall, except as otherwise provided therein, apply to carriers described in clauses (2), (3), and (4) of this subsection.

---

## NOTES 47 U.S.C. §152. Applicability of Consent Decrees and Other Law

Pub. L. 104–104, title VI, §601, Feb. 8, 1996, 110 Stat. 143, provided that:

 "(c) Federal, State, and Local Law.—"(1) No implied effect.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.

---

## *47 U.S.C. §153. Definitions*

For the purposes of this chapter, unless the context otherwise requires—
     **(1)  Advanced communications services --**    The term "advanced communications services" means— (A) interconnected VoIP service; (B) non-interconnected VoIP service; (C) electronic messaging service; and (D) interoperable video conferencing service.
          *
     **(11) Common carrier -** The term "common carrier" or "carrier" means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.
     **(12) Connecting carrier  -** The term "connecting carrier" means a carrier described in clauses (2), (3), or (4) of section 152(b) of this title.
          *

**(16) Customer premises equipment -** The term "customer premises equipment" means equipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications.

**(17) Dialing parity -** The term "dialing parity" means that a person that is not an affiliate of a local exchange carrier is able to provide telecommunications services in such a manner that customers have the ability to route automatically, without the use of any access code, their telecommunications to the telecommunications services provider of the customer's designation from among 2 or more telecommunications services providers (including such local exchange carrier).

       *

**(20) Exchange access -** The term "exchange access" means the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services.

       *

**(24) Information service -** The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

**(25) Interconnected VoIP service -** The term "interconnected VoIP service" has the meaning given such term under section 9.3 of title 47, Code of Federal Regulations, as such section may be amended from time to time.

       *

**(28) Interstate communication -** The term "interstate communication" or "interstate transmission" means communication or transmission (A) from any State, Territory, or possession of the United States (other than the Canal Zone), or the District of Columbia, to any other State, Territory, or possession of the United States (other than the Canal Zone), or the District of Columbia, (B) from or to the United States to or from the Canal Zone, insofar as such communication or transmission takes place within the United States, or (C) between points within the United States but through a foreign country; but shall not, with respect to the provisions of subchapter II of this chapter (other than section 223 of this title), include wire or radio communication between points in the same State, Territory, or possession of the United States, or the District of Columbia, through any place outside thereof, if such communication is regulated by a State commission.

       *

**(32) Local exchange carrier -** The term "local exchange carrier" means any person that is engaged in the provision of telephone exchange service or exchange

access. Such term does not include a person insofar as such person is engaged in the provision of a commercial mobile service under section 332(c) of this title, except to the extent that the Commission finds that such service should be included in the definition of such term.

**(33) Mobile service -** The term "mobile service" means a radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves, and includes (A) both one-way and two-way radio communication services, (B) a mobile service which provides a regularly interacting group of base, mobile, portable, and associated control and relay stations (whether licensed on an individual, cooperative, or multiple basis) for private one-way or two-way land mobile radio communications by eligible users over designated areas of operation, and (C) any service for which a license is required in a personal communications service established pursuant to the proceeding entitled "Amendment to the Commission's Rules to Establish New Personal Communications Services" (GEN Docket No. 90–314; ET Docket No. 92–100), or any successor proceeding.

  \*

**(36) Non-interconnected VoIP service -** The term "non-interconnected VoIP service"— (A) means a service that— (i)    enables    real-time    voice communications that originate from or terminate to the user's location using Internet protocol or any successor protocol; and    (ii) requires Internet protocol compatible customer premises equipment; and (B) does not include any service that is an interconnected VoIP service.

**(37) Number portability -** The term "number portability" means the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another.

  \*

**(44) Rural telephone company --** The term "rural telephone company" means a local exchange carrier operating entity to the extent that such entity— (A) provides common carrier service to any local exchange carrier study area that does not include either— (i) any incorporated place of 10,000 inhabitants or more, or any part thereof, based on the most recently available population statistics of the Bureau of the Census; or (ii) any territory, incorporated or unincorporated, included in an urbanized area, as defined by the Bureau of the Census as of August 10, 1993; (B) provides telephone exchange service, including exchange access, to fewer than 50,000 access lines; (C) provides telephone exchange service to any local exchange carrier study area with fewer than 100,000 access lines; or (D) has less than 15 percent of its access lines in communities of more than 50,000 on February 8, 1996.

SA-5

\*

**(48) State commission -** The term "State commission" means the commission, board, or official (by whatever name designated) which under the laws of any State has regulatory jurisdiction with respect to intrastate operations of carriers.

\*

**(50) Telecommunications -** The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

**(51) Telecommunications carrier -** The term "telecommunications carrier" means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

**(52) Telecommunications equipment --** The term "telecommunications equipment" means equipment, other than customer premises equipment, used by a carrier to provide telecommunications services, and includes software integral to such equipment (including upgrades).

**(53) Telecommunications service --** The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

**(54) Telephone exchange service --** The term "telephone exchange service" means (A) service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge, or (B) comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service.

**(55) Telephone toll service --** The term "telephone toll service" means telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service.

**(59) Wire communication --** The term "wire communication" or "communication by wire" means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection

between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

### *47 U.S.C. §154. Federal Communications Commission*

*

    **(i) Duties and powers  -** The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions.

*

### *47 U.S.C. §160. Competition in provision of telecommunications service*

    **(a) Regulatory flexibility --** Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that—

        (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

        (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

        (3) forbearance from applying such provision or regulation is consistent with the public interest.

    **(b) Competitive effect to be weighed -** In making the determination under subsection (a)(3) of this section, the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

    **(c) Petition for forbearance -** Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) of

this section within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a) of this section. The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

(d) **Limitation -** Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

(e) **State enforcement after Commission forbearance -** A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a) of this section.

---

## SUBCHAPTER II—COMMON CARRIERS

### Part I—Common Carrier Regulation

### *47 U.S.C. §201. Service and charges*

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided*, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further*, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the

Commission is of the opinion that such contract is not contrary to the public interest: *Provided further*, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

### *47 U.S.C. §214.*

(e) Provision of universal service

(1) Eligible telecommunications carriers - A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 of this title and shall, throughout the service area for which the designation is received—

(A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and

(B) advertise the availability of such services and the charges therefor using media of general distribution.

(2) Designation of eligible telecommunications carriers -- A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

(3) Designation of eligible telecommunications carriers for unserved areas - If no common carrier will provide the services that are supported by Federal universal service support mechanisms under section 254(c) of this title to an unserved community or any portion thereof that requests such service, the Commission, with respect to interstate services or an area served by a common carrier to which paragraph (6) applies, or a State commission, with respect to intrastate services, shall determine which common carrier or carriers are best able

to provide such service to the requesting unserved community or portion thereof and shall order such carrier or carriers to provide such service for that unserved community or portion thereof. Any carrier or carriers ordered to provide such service under this paragraph shall meet the requirements of paragraph (1) and shall be designated as an eligible telecommunications carrier for that community or portion thereof.

(4) Relinquishment of universal service - A State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall permit an eligible telecommunications carrier to relinquish its designation as such a carrier in any area served by more than one eligible telecommunications carrier. An eligible telecommunications carrier that seeks to relinquish its eligible telecommunications carrier designation for an area served by more than one eligible telecommunications carrier shall give advance notice to the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) of such relinquishment. Prior to permitting a telecommunications carrier designated as an eligible telecommunications carrier to cease providing universal service in an area served by more than one eligible telecommunications carrier, the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall require the remaining eligible telecommunications carrier or carriers to ensure that all customers served by the relinquishing carrier will continue to be served, and shall require sufficient notice to permit the purchase or construction of adequate facilities by any remaining eligible telecommunications carrier. The State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall establish a time, not to exceed one year after the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) approves such relinquishment under this paragraph, within which such purchase or construction shall be completed.

(5) "Service area" defined - The term "service area" means a geographic area established by a State commission (or the Commission under paragraph (6)) for the purpose of determining universal service obligations and support mechanisms. In the case of an area served by a rural telephone company, "service area" means such company's "study area" unless and until the Commission and the States, after taking into account recommendations of a Federal-State Joint Board instituted under section 410(c) of this title, establish a different definition of service area for such company.

(6) Common carriers not subject to State commission jurisdiction - In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of

paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law. Upon request and consistent with the public interest, convenience and necessity, the Commission may, with respect to an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated under this paragraph, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the Commission shall find that the designation is in the public interest.

### *47 U.S.C. §226. TELEPHONE OPERATOR SERVICES*

(a) Definitions

*

(2) The term "aggregator" means any person that, in the ordinary course of its operations, makes telephones available to the public or to transient users of its premises, for interstate telephone calls using a provider of operator services.

*

### Part II—Development of Competitive Markets

### *47 U.S.C. §251. Interconnection*

**(a) General duty of telecommunications carriers** Each telecommunications carrier has the duty— (1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers; and (2) not to install network features, functions, or capabilities that do not comply with the guidelines and standards established pursuant to section 255 or 256 of this title.

**(b) Obligations of all local exchange carriers** Each local exchange carrier has the following duties:

**(1) Resale** The duty not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services.

**(2) Number portability** The duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission.

**(3) Dialing parity** The duty to provide dialing parity to competing providers of telephone exchange service and telephone toll service, and the duty to permit all such providers to have nondiscriminatory access to telephone numbers,

operator services, directory assistance, and directory listing, with no unreasonable dialing delays.

(4) **Access to rights-of-way** The duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 of this title.

(5) **Reciprocal compensation** The duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications.

**(c) Additional obligations of incumbent local exchange carriers**

In addition to the duties contained in subsection (b) of this section, each incumbent local exchange carrier has the following duties:

(1) **Duty to negotiate** The duty to negotiate in good faith in accordance with section 252 of this title the particular terms and conditions of agreements to fulfill the duties described in paragraphs (1) through (5) of subsection (b) of this section and this subsection. The requesting telecommunications carrier also has the duty to negotiate in good faith the terms and conditions of such agreements.

(2) **Interconnection** The duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network—

(A) for the transmission and routing of telephone exchange service and exchange access;

(B) at any technically feasible point within the carrier's network;

(C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and

(D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title.

(3) **Unbundled access** The duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory in accordance with the terms and conditions of the agreement and the requirements of this section and section 252 of this title. An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

SA-12

**(4) Resale** The duty—

    (A) to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers; and

    (B) not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of such telecommunications service, except that a State commission may, consistent with regulations prescribed by the Commission under this section, prohibit a reseller that obtains at wholesale rates a telecommunications service that is available at retail only to a category of subscribers from offering such service to a different category of subscribers.

    **(5) Notice of changes** The duty to provide reasonable public notice of changes in the information necessary for the transmission and routing of services using that local exchange carrier's facilities or networks, as well as of any other changes that would affect the interoperability of those facilities and networks.

    **(6) Collocation** The duty to provide, on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, for physical collocation of equipment necessary for interconnection or access to unbundled network elements at the premises of the local exchange carrier, except that the carrier may provide for virtual collocation if the local exchange carrier demonstrates to the State commission that physical collocation is not practical for technical reasons or because of space limitations.

    **(d) Implementation**

    **(1) In general** Within 6 months after February 8, 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section.

    **(2) Access standards** In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Commission shall consider, at a minimum, whether—

    (A) access to such network elements as are proprietary in nature is necessary; and

    (B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.

    **(3) Preservation of State access regulations** In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that—

    (A) establishes access and interconnection obligations of local exchange carriers;

    (B) is consistent with the requirements of this section; and

(C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

**(e) Numbering administration**

**(1) Commission authority and jurisdiction** The Commission shall create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis. The Commission shall have exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States. Nothing in this paragraph shall preclude the Commission from delegating to State commissions or other entities all or any portion of such jurisdiction.

**(2) Costs** The cost of establishing telecommunications numbering administration arrangements and number portability shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission.

**(3) Universal emergency telephone number** The Commission and any agency or entity to which the Commission has delegated authority under this subsection shall designate 9–1–1 as the universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance. The designation shall apply to both wireline and wireless telephone service. In making the designation, the Commission (and any such agency or entity) shall provide appropriate transition periods for areas in which 9–1–1 is not in use as an emergency telephone number on October 26, 1999.

**(f) Exemptions, suspensions, and modifications**

**(1) Exemption for certain rural telephone companies**

**(A) Exemption** Subsection (c) of this section shall not apply to a rural telephone company until (i) such company has received a bona fide request for interconnection, services, or network elements, and (ii) the State commission determines (under subparagraph (B)) that such request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof).

**(B) State termination of exemption and implementation schedule** The party making a bona fide request of a rural telephone company for interconnection, services, or network elements shall submit a notice of its request to the State commission. The State commission shall conduct an inquiry for the purpose of determining whether to terminate the exemption under subparagraph (A). Within 120 days after the State commission receives notice of the request, the State commission shall terminate the exemption if the request is not unduly economically burdensome, is technically feasible, and is consistent with section 254 of this title (other than subsections (b)(7) and (c)(1)(D) thereof). Upon termination of the exemption, a State commission shall establish an

implementation schedule for compliance with the request that is consistent in time and manner with Commission regulations.

**(C) Limitation on exemption** The exemption provided by this paragraph shall not apply with respect to a request under subsection (c) of this section from a cable operator providing video programming, and seeking to provide any telecommunications service, in the area in which the rural telephone company provides video programming. The limitation contained in this subparagraph shall not apply to a rural telephone company that is providing video programming on February 8, 1996.

**(2) Suspensions and modifications for rural carriers** A local exchange carrier with fewer than 2 percent of the Nation's subscriber lines installed in the aggregate nationwide may petition a State commission for a suspension or modification of the application of a requirement or requirements of subsection (b) or (c) of this section to telephone exchange service facilities specified in such petition. The State commission shall grant such petition to the extent that, and for such duration as, the State commission determines that such suspension or modification— (A) is necessary— (i) to avoid a significant adverse economic impact on users of telecommunications services generally; (ii) to avoid imposing a requirement that is unduly economically burdensome; or (iii) to avoid imposing a requirement that is technically infeasible; and (B) is consistent with the public interest, convenience, and necessity. The State commission shall act upon any petition filed under this paragraph within 180 days after receiving such petition. Pending such action, the State commission may suspend enforcement of the requirement or requirements to which the petition applies with respect to the petitioning carrier or carriers.

**(g) Continued enforcement of exchange access and interconnection requirements** On and after February 8, 1996, each local exchange carrier, to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to interexchange carriers and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (including receipt of compensation) that apply to such carrier on the date immediately preceding February 8, 1996, under any court order, consent decree, or regulation, order, or policy of the Commission, until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission after February 8, 1996. During the period beginning on February 8, 1996, and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

**(h) "Incumbent local exchange carrier" defined**

**(1) Definition** For purposes of this section, the term "incumbent local exchange carrier" means, with respect to an area, the local exchange carrier that— (A) on February 8, 1996, provided telephone exchange service in such area; and (B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. 69.601(b)); or (ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).

**(2) Treatment of comparable carriers as incumbents** The Commission may, by rule, provide for the treatment of a local exchange carrier (or class or category thereof) as an incumbent local exchange carrier for purposes of this section if— (A) such carrier occupies a position in the market for telephone exchange service within an area that is comparable to the position occupied by a carrier described in paragraph (1); (B) such carrier has substantially replaced an incumbent local exchange carrier described in paragraph (1); and (C) such treatment is consistent with the public interest, convenience, and necessity and the purposes of this section.

**(i) Savings provision** Nothing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title.

---

***47 U.S.C. §252.**
**Procedures for negotiation, arbitration, and approval of agreements***

**(a) Agreements arrived at through negotiation**

**(1) Voluntary negotiations** Upon receiving a request for interconnection, services, or network elements pursuant to section 251 of this title, an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title. The agreement shall include a detailed schedule of itemized charges for interconnection and each service or network element included in the agreement. The agreement, including any interconnection agreement negotiated before February 8, 1996, shall be submitted to the State commission under subsection (e) of this section.

**(2) Mediation** Any party negotiating an agreement under this section may, at any point in the negotiation, ask a State commission to participate in the negotiation and to mediate any differences arising in the course of the negotiation.

**(b) Agreements arrived at through compulsory arbitration**

**(1) Arbitration** During the period from the 135th to the 160th day (inclusive) after the date on which an incumbent local exchange carrier receives a

request for negotiation under this section, the carrier or any other party to the negotiation may petition a State commission to arbitrate any open issues.

      **(2) Duty of petitioner**

          (A) A party that petitions a State commission under paragraph

          (1) shall, at the same time as it submits the petition, provide the State commission all relevant documentation concerning— (i) the unresolved issues; (ii) the position of each of the parties with respect to those issues; and   (iii) any other issue discussed and resolved by the parties.

          (B) A party petitioning a State commission under paragraph (1) shall provide a copy of the petition and any documentation to the other party or parties not later than the day on which the State commission receives the petition.

      **(3) Opportunity to respond** A non-petitioning party to a negotiation under this section may respond to the other party's petition and provide such additional information as it wishes within 25 days after the State commission receives the petition.

      **(4) Action by State commission**

          (A) The State commission shall limit its consideration of any petition under paragraph (1) (and any response thereto) to the issues set forth in the petition and in the response, if any, filed under paragraph (3).

          (B) The State commission may require the petitioning party and the responding party to provide such information as may be necessary for the State commission to reach a decision on the unresolved issues. If any party refuses or fails unreasonably to respond on a timely basis to any reasonable request from the State commission, then the State commission may proceed on the basis of the best information available to it from whatever source derived.

          (C) The State commission shall resolve each issue set forth in the petition and the response, if any, by imposing appropriate conditions as required to implement subsection (c) of this section upon the parties to the agreement, and shall conclude the resolution of any unresolved issues not later than 9 months after the date on which the local exchange carrier received the request under this section.

      **(5) Refusal to negotiate** The refusal of any other party to the negotiation to participate further in the negotiations, to cooperate with the State commission in carrying out its function as an arbitrator, or to continue to negotiate in good faith in the presence, or with the assistance, of the State commission shall be considered a failure to negotiate in good faith.

   **(c) Standards for arbitration** In resolving by arbitration under subsection (b) of this section any open issues and imposing conditions upon the parties to the agreement, a State commission shall—

(1) ensure that such resolution and conditions meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title;

(2) establish any rates for interconnection, services, or network elements according to subsection (d) of this section; and

(3) provide a schedule for implementation of the terms and conditions by the parties to the agreement.

**(d) Pricing standards**

**(1) Interconnection and network element charges** Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and equipment for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section—

(A) shall be—

(i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and

(ii) nondiscriminatory, and

(B) may include a reasonable profit.

**(2) Charges for transport and termination of traffic**

**(A) In general**

For the purposes of compliance by an incumbent local exchange carrier with section 251(b)(5) of this title, a State commission shall not consider the terms and conditions for reciprocal compensation to be just and reasonable unless—

(i) such terms and conditions provide for the mutual and reciprocal recovery by each carrier of costs associated with the transport and termination on each carrier's network facilities of calls that originate on the network facilities of the other carrier; and

(ii) such terms and conditions determine such costs on the basis of a reasonable approximation of the additional costs of terminating such calls.

**(B) Rules of construction**

This paragraph shall not be construed—

(i) to preclude arrangements that afford the mutual recovery of costs through the offsetting of reciprocal obligations, including arrangements that waive mutual recovery (such as bill-and-keep arrangements); or

(ii) to authorize the Commission or any State commission to engage in any rate regulation proceeding to establish with particularity the

additional costs of transporting or terminating calls, or to require carriers to maintain records with respect to the additional costs of such calls.

(3) **Wholesale prices for telecommunications services** For the purposes of section 251(c)(4) of this title, a State commission shall determine wholesale rates on the basis of retail rates charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier.

**(e) Approval by State commission**

(1) **Approval required** Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

(2) **Grounds for rejection** The State commission may only reject—

(A) an agreement (or any portion thereof) adopted by negotiation under subsection (a) of this section if it finds that—

(i) the agreement (or portion thereof) discriminates against a telecommunications carrier not a party to the agreement; or

(ii) the implementation of such agreement or portion is not consistent with the public interest, convenience, and necessity; or

(B) an agreement (or any portion thereof) adopted by arbitration under subsection (b) of this section if it finds that the agreement does not meet the requirements of section 251 of this title, including the regulations prescribed by the Commission pursuant to section 251 of this title, or the standards set forth in subsection (d) of this section.

(3) **Preservation of authority** Notwithstanding paragraph (2), but subject to section 253 of this title, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

(4) **Schedule for decision** If the State commission does not act to approve or reject the agreement within 90 days after submission by the parties of an agreement adopted by negotiation under subsection (a) of this section, or within 30 days after submission by the parties of an agreement adopted by arbitration under subsection (b) of this section, the agreement shall be deemed approved. No State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section.

(5) **Commission to act if State will not act** If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the Commission shall issue an order preempting the

State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission.

    **(6) Review of State commission actions** In a case in which a State fails to act as described in paragraph (5), the proceeding by the Commission under such paragraph and any judicial review of the Commission's actions shall be the exclusive remedies for a State commission's failure to act. In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.

    **(f) Statements of generally available terms**

        **(1) In general** A Bell operating company may prepare and file with a State commission a statement of the terms and conditions that such company generally offers within that State to comply with the requirements of section 251 of this title and the regulations thereunder and the standards applicable under this section.

        **(2) State commission review** A State commission may not approve such statement unless such statement complies with subsection (d) of this section and section 251 of this title and the regulations thereunder. Except as provided in section 253 of this title, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of such statement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

        **(3) Schedule for review** The State commission to which a statement is submitted shall, not later than 60 days after the date of such submission—
(A) complete the review of such statement under paragraph (2) (including any reconsideration thereof), unless the submitting carrier agrees to an extension of the period for such review; or (B) permit such statement to take effect.

        **(4) Authority to continue review** Paragraph (3) shall not preclude the State commission from continuing to review a statement that has been permitted to take effect under subparagraph (B) of such paragraph or from approving or disapproving such statement under paragraph (2).

        **(5) Duty to negotiate not affected** The submission or approval of a statement under this subsection shall not relieve a Bell operating company of its duty to negotiate the terms and conditions of an agreement under section 251 of this title.

        **(g) Consolidation of State proceedings** Where not inconsistent with the requirements of this chapter, a State commission may, to the extent practical,

consolidate proceedings under sections 214(e), 251(f), 253 of this title, and this section in order to reduce administrative burdens on telecommunications carriers, other parties to the proceedings, and the State commission in carrying out its responsibilities under this chapter.

      **(h) Filing required** A State commission shall make a copy of each agreement approved under subsection (e) of this section and each statement approved under subsection (f) of this section available for public inspection and copying within 10 days after the agreement or statement is approved. The State commission may charge a reasonable and nondiscriminatory fee to the parties to the agreement or to the party filing the statement to cover the costs of approving and filing such agreement or statement.

      **(i) Availability to other telecommunications carriers** A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement.

      **(j) "Incumbent local exchange carrier" defined** For purposes of this section, the term "incumbent local exchange carrier" has the meaning provided in section 251(h) of this title.

---

### *47 U.S.C. §253. Removal of barriers to entry*

      **(a) In general** No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

      **(b) State regulatory authority** Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

      **(c) State and local government authority** Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

      **(d) Preemption** If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute,

regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

(e) **Commercial mobile service providers** Nothing in this section shall affect the application of section 332(c)(3) of this title to commercial mobile service providers.

(f) **Rural markets** It shall not be a violation of this section for a State to require a telecommunications carrier that seeks to provide telephone exchange service or exchange access in a service area served by a rural telephone company to meet the requirements in section 214(e)(1) of this title for designation as an eligible telecommunications carrier for that area before being permitted to provide such service. This subsection shall not apply—

(1) to a service area served by a rural telephone company that has obtained an exemption, suspension, or modification of section 251(c)(4) of this title that effectively prevents a competitor from meeting the requirements of section 214(e)(1) of this title; and

(2) to a provider of commercial mobile services.

---

### *47 U.S.C. §254. Universal service*

(a) **Procedures to review universal service requirements**

(1) **Federal-State Joint Board on universal service** Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

(2) **Commission action** The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

**(b) Universal service principles** The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

  **(1) Quality and rates** Quality services should be available at just, reasonable, and affordable rates.

  **(2) Access to advanced services** Access to advanced telecommunications and information services should be provided in all regions of the Nation.

  **(3) Access in rural and high cost areas** Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

  **(4) Equitable and nondiscriminatory contributions** All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

  **(5) Specific and predictable support mechanisms** There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

  **(6) Access to advanced telecommunications services for schools, health care, and libraries** Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h) of this section.

  **(7) Additional principles** Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

**(c) Definition**

  **(1) In general** Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

    (A) are essential to education, public health, or public safety;

    (B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

SA-23

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

(2) **Alterations and modifications** The Joint oard may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

(3) **Special services** In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h) of this section.

(d) **Telecommunications carrier contribution** Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

(e) **Universal service support** After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

(f) **State authority** A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

(g) **Interexchange and interstate services** Within 6 months after February 8, 1996, the Commission shall adopt rules to require that the rates charged by

providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas. Such rules shall also require that a provider of interstate interexchange telecommunications services shall provide such services to its subscribers in each State at rates no higher than the rates charged to its subscribers in any other State.

**(h) Telecommunications services for certain providers**
**(1) In general**
*

**(2) Advanced services** The Commission shall establish competitively neutral rules— (A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and (B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

---

### 47 U.S.C. §261. Effect on other requirements

**(a) Commission regulations -** Nothing in this part shall be construed to prohibit the Commission from enforcing regulations prescribed prior to February 8, 1996, in fulfilling the requirements of this part, to the extent that such regulations are not inconsistent with the provisions of this part.

**(b) Existing State regulations -** Nothing in this part shall be construed to prohibit any State commission from enforcing regulations prescribed prior to February 8, 1996, or from prescribing regulations after February 8, 1996, in fulfilling the requirements of this part, if such regulations are not inconsistent with the provisions of this part.

**(c) Additional State requirements -** Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part.

---

### SUBCHAPTER III—SPECIAL PROVISIONS RELATING TO RADIO

### 47 U.S.C. §332. Mobile services
*
**(c) Regulatory treatment of mobile services**
    **(1) Common carrier treatment of commercial mobile services**

(A) A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter, except for such provisions of subchapter II of this chapter as the Commission may specify by regulation as inapplicable to that service or person. In prescribing or amending any such regulation, the Commission may not specify any provision of section 201, 202, or 208 of this title, and may specify any other provision only if the Commission determines that—

(i) enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;

(ii) enforcement of such provision is not necessary for the protection of consumers; and

(iii) specifying such provision is consistent with the public interest.

(B) Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of this title. Except to the extent that the Commission is required to respond to such a request, this subparagraph shall not be construed as a limitation or expansion of the Commission's authority to order interconnection pursuant to this chapter.

(C) The Commission shall review competitive market conditions with respect to commercial mobile services and shall include in its annual report an analysis of those conditions. Such analysis shall include an identification of the number of competitors in various commercial mobile services, an analysis of whether or not there is effective competition, an analysis of whether any of such competitors have a dominant share of the market for such services, and a statement of whether additional providers or classes of providers in those services would be likely to enhance competition. As a part of making a determination with respect to the public interest under subparagraph (A)(iii), the Commission shall consider whether the proposed regulation (or amendment thereof) will promote competitive market conditions, including the extent to which such regulation (or amendment) will enhance competition among providers of commercial mobile services. If the Commission determines that such regulation (or amendment) will promote competition among providers of commercial mobile services, such determination may be the basis for a Commission finding that such regulation (or amendment) is in the public interest.

(D) The Commission shall, not later than 180 days after August 10, 1993, complete a rulemaking required to implement this paragraph with respect to

the licensing of personal communications services, including making any determinations required by subparagraph (C).

**(2) Non-common carrier treatment of private mobile services -** A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter. A common carrier (other than a person that was treated as a provider of a private land mobile service prior to August 10, 1993) shall not provide any dispatch service on any frequency allocated for common carrier service, except to the extent such dispatch service is provided on stations licensed in the domestic public land mobile radio service before January 1, 1982. The Commission may by regulation terminate, in whole or in part, the prohibition contained in the preceding sentence if the Commission determines that such termination will serve the public interest.

**(3) State preemption –**

(A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—

(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or

(ii) such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State.

The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition. If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

(B) If a State has in effect on June 1, 1993, any regulation concerning the rates for any commercial mobile service offered in such State on such date, such State may, no later than 1 year after August 10, 1993, petition the Commission requesting that the State be authorized to continue exercising authority over such rates. If a State files such a petition, the State's existing regulation shall, notwithstanding subparagraph (A), remain in effect until the Commission completes all action (including any reconsideration) on such petition. The Commission shall review such petition in accordance with the procedures established in such subparagraph, shall complete all action (including any reconsideration) within 12 months after such petition is filed, and shall grant such petition if the State satisfies the showing required under subparagraph (A)(i) or (A)(ii). If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such period of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory. After a reasonable period of time, as determined by the Commission, has elapsed from the issuance of an order under subparagraph (A) or this subparagraph, any interested party may petition the Commission for an order that the exercise of authority by a State pursuant to such subparagraph is no longer necessary to ensure that the rates for commercial mobile services are just and reasonable and not unjustly or unreasonably discriminatory. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition in whole or in part.

\*

**(C)  Definitions**

For purposes of this paragraph—

(i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

(iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) of this title).

**(8) Mobile services access --** A person engaged in the provision of commercial mobile services, insofar as such person is so engaged, shall not be required to provide equal access to common carriers for the provision of telephone toll services. If the Commission determines that subscribers to such services are

denied access to the provider of telephone toll services of the subscribers' choice, and that such denial is contrary to the public interest, convenience, and necessity, then the Commission shall prescribe regulations to afford subscribers unblocked access to the provider of telephone toll services of the subscribers' choice through the use of a carrier identification code assigned to such provider or other mechanism. The requirements for unblocking shall not apply to mobile satellite services unless the Commission finds it to be in the public interest to apply such requirements to such services.

(d) **Definitions** For purposes of this section—

(1) the term "commercial mobile service" means any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as so to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

(2) the term "interconnected service" means service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c)(1)(B) of this section; and

(3) the term "private mobile service" means any mobile service (as defined in section 153 of this title) that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission.

## SUBCHAPTER VI—MISCELLANEOUS PROVISIONS

### §617. Access to advanced communications services and equipment
*

(f) Services and equipment subject to section 255 of this title
The requirements of this section shall not apply to any equipment or services, including interconnected VoIP service, that are subject to the requirements of section 255 of this title on the day before October 8, 2010. Such services and equipment shall remain subject to the requirements of section 255 of this title.

## CHAPTER 12—BROADBAND

### 47 U.S.C. §1302. Advanced telecommunications incentives

(a) In general - The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary

schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

(b) Inquiry - The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

(c) Demographic information for unserved areas - As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1)) [1] and to the extent that data from the Census Bureau is available, determine, for each such unserved area— (1) the population; (2) the population density; and (3) the average per capita income.

(d) Definitions For purposes of this subsection:

(1) Advanced telecommunications capability - The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

(2) Elementary and secondary schools -- The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of title 20.